WERNER H. ERHARD and ELLEN V. ERHARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Erhard v. Commissioner
Docket Nos. 39473-85, 46712-86, 39532-87, 137-88
United States Tax Court
T.C. Memo 1991-290; 1991 Tax Ct. Memo LEXIS 336; 62 T.C.M. (CCH) 1; T.C.M. (RIA) 91290; July 1, 1991, Filed *336 Decision will be entered under Rule 155. Michael I. Saltzman, Barbara T. Kaplan, and Robert F. Hermann, for the petitioner. Carmen M. Baerga, Craig Connell, Mildred M. Moon, and Ray A. Kahn, for the respondent. Scott, Judge. Gussis, Special Trial Judge. SCOTT
MEMORANDUM FINDINGS OF FACT AND OPINION *337 These consolidated cases were assigned for trial or other disposition to Special Trial Judge James M. Gussis pursuant to section 7443A(b) of the Internal Revenue Code and Rule 180 et seq. [1] This Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE Respondent has determined the following Federal income tax deficiencies, increased interest and additions to tax: Increased Interest and
Docket
Income Tax
Additions to Tax Sections
Nos.
Year
Deficiency
6621(c)
6653(a)(1)
6653(a)(2)
39473-85
1981
$ 456,431.00
--     $ 22,822.00
*
46712-86
1982
747,413.50
Applicable
37,676.00 **
39532-87
1983
494,446.00
Applicable
24,722.00 ***
137-88
1983
494,446.00
Applicable
24,722.00 ***
Docket
Nos.
6661
39473-85
--     46712-86
$  75,352.00
39532-87
123,612.00
137-88
123,612.00
On November 1, 1988, the Court granted respondent's motion in docket No. 39473-85 to increase the interest rate on the underlying deficiency for the year 1981 pursuant to section 6621(c). In an amendment to his answer in docket No. 46712-86 respondent claimed an increased addition to tax under section 6661 of 25 percent of the underpayment for the year 1982, or $ 186,853.37. Petitioner Ellen V. Erhard did not appear at the trial of these cases. On March 23, 1989, she filed with the Tax Court an Agreement to be Bound by the decision of the Tax Court in these cases. The issues, which were consolidated for purposes *338 of trial, briefing and opinion, are (1) whether petitioners are entitled to an interest expense deduction in 1981 with respect to certain purported loans from Terla, B.V.; (2) whether petitioners are entitled to an interest expense deduction in 1981, 1982, and 1983 with respect to a purported $ 14,000,000 loan from Intercultural Cooperation Foundation; (3) whether petitioners are entitled to an interest expense deduction in 1982 with respect to a purported $ 1,000,000 loan from Intercultural Cooperation Foundation; (4) whether petitioners have established a basis for depreciation purposes in 1981, 1982, and 1983 in the assets purportedly acquired from est, an educational corp., the Werner Erhard Charitable Settlement, Associated Advisors, Presentaciones Musicales, S.A., and Welbehagen; (5) whether petitioners are liable for the additions to tax under section 6653(a)(1) and (2) in 1981, 1982, and 1983; (6) whether petitioners are liable for additions to tax under section 6661 in 1982 and 1983; and (7) whether petitioners are liable for the increased interest under section 6621(c) in 1981, 1982, and 1983. FINDINGS OF FACT Some of the facts were stipulated and they are herein incorporated *339 by this reference. Werner H. Erhard (sometimes referred to herein individually as petitioner) was a resident of Sausalito, California, and petitioner Ellen Erhard was a resident of Novato, California at the time the petitions herein were filed. Petitioners timely filed joint Federal income tax returns for the years 1981, 1982, and 1983 with the Fresno Service Center. [2]
Werner Erhard is the proprietor of Werner Erhard & Associates (hereinafter WEA) which was formed in 1981 to offer seminars, workshops and other programs in personal effectiveness to the public. Prior to the formation of WEA, a variety of programs, seminars, workshops and lectures concerned with personal effectiveness were offered to the public by est, a.e.c. The *340 major program marketed by est, a.e.c. was the est training program which involved the effective delivery of certain ideas, concepts and know-how embodied within the collective term, the Body of Knowledge. The Body of Knowledge was created by Werner Erhard, who was also the original developer of the est training. Erhard continued as the primary developer of the training and he decided when a particular trainer was qualified or capable of leading the training. Erhard received W-2 income from est, a.e.c. in the years 1975 through early 1981. Prior to the formation of WEA in 1981, est, a.e.c. had between 300 and 350 employees and owned the requisite business assets for its operations such as leaseholds, leasehold improvements and computer equipment. By 1980, the est training program had been delivered to between 250,000 and 300,000 individuals. The various services provided by Erhard were indispensable to the effectiveness and profitability of the est, a.e.c. operations. Harry Margolis became the personal legal and financial advisor for Werner Erhard in 1971, in which year Margolis also arranged the formation and financing of Erhard Seminars Training, Inc., for the purpose of presenting *341 seminars to the public. These seminars were based upon concepts which Werner Erhard originated and which became known as the Body of Knowledge. Margolis became legal advisor to Erhard Seminars Training, Inc., and handled the accounting and financial aspects of the corporation. The activities of Erhard Seminars Training, Inc., were subsequently taken over in 1975 by a new corporation, est, a.e.c., a corporation formed under the laws of Nevada. The stock of est, a.e.c. was held by the Werner Erhard Charitable Settlement, an entity formed under the laws of the Channel Island of Jersey. Alexia Trust Co., was the trustee for the Werner Erhard Charitable Settlement. The Werner Erhard Charitable Settlement, together with a charitable organization in Switzerland called the Werner Erhard Foundation for est, a.e.c., owned a holding company in Switzerland, WEF est Holding, A.G., which in turn owned a company in the Netherlands called Welbehagen, B.V. Margolis devised the financial and legal structure of est, a.e.c. and continued in his involvement and tax planning for the new corporation. Margolis was the legal and financial advisor, tax return preparer, banker and accountant for est, *342 a.e.c. between 1975 and 1981. For the most part, the employees of Erhard Seminars Training, Inc., continued in the employment of est, a.e.c. Under agreements prepared by or at the direction of Margolis, effective September 1, 1975, Presentaciones Musicales, S.A. (PMSA), a Panamanian Co., sold the Body of Knowledge to Welbehagen, B.V., which licensed the Body of Knowledge in the United States to est, a.e.c. and to organizations in other countries. Under this arrangement, est, a.e.c. deducted amortization and interest paid to Welbehagen. est, a.e.c. received funds of capital contributions from Werner Erhard Charitable Settlement. est, a.e.c., with headquarters at 765 California Street in San Francisco, California, was managed by professional and fully qualified managers. In 1980, there were centers in some 30 cities throughout the United States managed by local managers who reported to headquarters through area managers. Personnel matters, administration, communications, training programs and international operations were managed from headquarters. A division of est, a.e.c. called the office of Werner Erhard was located at the Franklin House at 1945 Franklin Street in San Francisco, *343 with its own staff of aides, communicators and administrative personnel. The members of the office of Chief Executive and other executives made up an executive group which oversaw the operations of seven divisions: Centers management, international, communications, personnel, the academy, administration and the office of Werner Erhard. The delivery of programs by est, a.e.c. was seasonal in nature, with business operations running in trimesters beginning in February, June, and October. Revenues were highest in the trimester from June through September. The trimester beginning in October was the seasonal low. For its fiscal year ended June 30, 1980, est, a.e.c. reported gross receipts from operations in the amount of $ 23,368,328 and, after deductions which included amortization and interest expense deductions, reported zero taxable income. The Harry Margolis system was a group of off-shore and domestic corporations, trusts, banks, partnerships and other entities used by Margolis to implement his tax planning for clients. A system entity refers to an individual entity within the system. System entities were controlled either directly or indirectly by Margolis, his law office *344 or his employees. System entities included the following: Alexia Trust Co., (hereinafter Alexia); Antigua Banking, Ltd.; Aruba Bonaire Curacao Trust Co., (hereinafter ABC Trust); Associated Advisors; Erik Holding Co.; Island Bank (British Virgin Islands) Ltd., (hereinafter Island Bank, Ltd.); Kempold, B.V.; Mator, S.A.; Mundial Investment; Parallax Corp., a Panamanian Corp.; Presentaciones Musicales, S.A. (hereinafter PMSA); Sineuri, S.A., a Panamanian Co.; Terla, B.V.; Truma, B.V., a Netherlands Co.; Welbehagen, B.V.; Werner Erhard Charitable Settlement; and Werner Erhard Foundation for est, a.e.c. Erik Holding, B.V., Terla, B.V., and Kempold, B.V., were systems entities registered in the Netherlands that provided almost identical functions in the Harry Margolis system. The system entities served identical functions in that they processed loans for individuals and entities who generally were clients of Margolis. With respect to the functions of Island Bank, Ltd., almost all of its customers were affiliated with Margolis. Island Bank, Ltd., itself did not make loans. Instead, Island Bank, Ltd., made funds available to overseas system entities which in turn would make the actual *345 loans. The process by which Island Bank, Ltd., made funds available to an overseas system entity followed a standard procedure in the operation of the Harry Margolis system. Generally, the overseas system entity would agree to make a loan and Island Bank, Ltd., would then provide the necessary financing by making the funds available to the lending entity. The lending process would be initiated by a request from the office of Harry Margolis. Island Bank, Ltd., and the lending entity would both be managed by Mator, S.A., and the same individuals would act for both. Mator, S.A., was a trust management company providing accounting, administrative, statutory and other related services for corporate entities. The representation of clients in the office of Harry Margolis generally consisted of (1) an initial phase during which the client's goals were defined and documents were drafted to realize such goals; and (2) an implementation stage during which the required relationships were established; and (3) a so-called clean-up phase when the client desired to terminate the contractual relationships which were then phased out. Where required, money movements would be made in order to *346 complete the clean-up phase. The est, a.e.c. organizational structure devised by Margolis in 1975 was a maze of intertwined organizations with numerous agreements among the entities involved. After est, a.e.c. was formed by Margolis in 1975, he created system entities which dealt only with est, a.e.c. These system entities included Welbehagen, B.V., Werner Erhard Charitable Settlement, the Werner Erhard Foundation for est, and WEF est Holding, A.G. Welbehagen, B.V., was an entity in Holland; Werner Erhard Charitable Settlement was situated in the Isle of Jersey; Werner Erhard Foundation for est and WEF est Holding, A.G., were Swiss entities; est, a.e.c. was a Nevada Corp. Alexia, the trustee of Werner Erhard Charitable Settlement, was a trust company situated in the Isle of Jersey. Werner Erhard Charitable Settlement, in addition to owning all of the stock in est, a.e.c., also held an interest in the Swiss holding company, which in turn owned all of the stock in Welbehagen, B.V. The gross profits reported by est, a.e.c. in the taxable years ended June 30, 1975, through 1981 were in the following respective amounts: $ 7,294,742, $ 9,322,668, $ 11,271,827, $ 14,956,956, $ 17,155,518 *347 and $ 15,510,121. During this entire period est, a.e.c. reported total taxable income of approximately $ 100,000. In the course of the management by Margolis of the financial affairs of Werner Erhard, Erhard incurred an indebtedness of about $ 1,000,000 to Barclays Kol in the Netherlands and also incurred financial obligations to the system entities Associated Advisors and Antigua Banking, Ltd. In 1976 Margolis was indicted on criminal tax charges arising from his tax planning activities. He was acquitted of all charges in 1977. After the indictment of Margolis, Erhard and his executives became concerned over the impact on their business operations in view of the role played by Margolis in such operations. On or about January 11, 1980, Werner Erhard announced his initiation of a project to reexamine and analyze the legal, financial and organizational structure of est, a.e.c. and its predecessor, Erhard Seminar Training, and the formation of a task team to implement the project. The task team was composed of several est, a.e.c. executives and staff members and other professionals in the fields of law and management. The purpose of the project was to "create est anew." In April *348 1980 the est organization was informed of the formation of a new office of Chief Executive within est, a.e.c. All of the legal, financial, accounting, banking and tax work for both Erhard Seminar Training and est, a.e.c. had been conducted by Margolis. Neither Erhard nor the est, a.e.c. executives had a clear understanding of the maze of foreign and domestic entities, all associated with Margolis, that surrounded est, a.e.c. Nor did Erhard have a complete and accurate understanding of his personal financial situation in early 1980. In May 1980 Margolis, in a memorandum to Charles O. Johnston, an est, a.e.c. executive, outlined his recommendations concerning the distribution of 10-year bonuses to est, a.e.c. employees. In a May 8, 1980, memorandum Erhard advised the est staff that, together with Margolis and the task team, Erhard had for sometime been examining the role of est's legal counsel in the project to "create est anew", and had now jointly determined to replace the Harry Margolis office as the general and tax counsel of est, a.e.c. In a memorandum dated April 30, 1980, from Margolis to Ellis M. Deull, an attorney for est, a.e.c. and for Werner Erhard personally, Margolis *349 indicated his understanding with Werner Erhard that the office of Harry Margolis would be responsible for the tax matters of est, a.e.c. through June 30, 1980. With respect to the period after July 1, 1980, Margolis indicated in the memorandum that in the event "our structure is utilized, we expect to collect fees and costs as in the past." In a memorandum to Deull dated May 24, 1980, Margolis stated that at the time est, a.e.c. was formed in 1975, it was contemplated that the new corporation would probably not remain in existence for more than three years. Prior to 1981, the office of Harry Margolis maintained a so-called system accounting for the clients of Margolis which recorded funds flowing into the system from the client or non-system entities and funds flowing out of the system to the client or non-system entities. The system accounting was a chronological history of the transactions of a client within the system and kept track of the client's balance, either positive or negative, within the system. All funds flowing into the system from a client or a non-system entity were entered in the system accounting as a credit while all funds flowing out of the system to a client *350 or a non-system entity were entered in the system accounting as a debit. A client earned interest on positive balances in the system accounting maintained for him and was charged interest on negative balances. Transactions between system entities were not recorded in the system accounting since the funds stayed within the system. The office of Harry Margolis maintained only one combined system accounting for Werner Erhard and est, a.e.c. Inez Teague was employed in the office of Harry Margolis in 1971 as a staff accountant and then undertook the duties of coordinating the banking activities of the office. Her employment continued with the office until 1984. Paul T. Mason was a business associate of Margolis and was managing director of Island Bank, Ltd., and Sineuri, S.A., in Panama. Prior to 1982, he also managed Mator, S.A., a trust management company that provided management services to various corporate entities. Such services included accounting, administrative, and other statutory services required under government regulations. Most of the Mator, S.A., clients were corporations that had dealings with Margolis and attorneys currently or previously associated with him. *351 Everd B. van Walsum was a business associate of Margolis. During the year 1982 1981 van Walsum was president of Mator, S.A. He was also the managing director of Alexia and Truma, B.V. Arthur H. Schreiber was house counsel for est, a.e.c. from 1979 to 1981. In June 1981 he became general counsel to WEA and since the middle of 1987 he has been the chief operating officer of WEA. During the period from about February 20, 1981, to May 31, 1981, Schreiber served in a dual capacity as an employee of est, a.e.c. and as an associate of WEA. Michael Eisenberg was an executive in the accounting office of est, a.e.c. from September 1978 through May 1981. He was employed by WEA in various financial capacities from June 1981 through February 1988. Johnston was employed as chief financial officer for est, a.e.c. in or about January 1980 and in June 1981 he commenced employment with WEA. He left WEA in or about May 1982. Robert R. Curtis was employed in various executive capacities by est, a.e.c. until May 31, 1981, when he became employed by WEA. Pat Dillan was employed in an administrative capacity in the chief executive office of est, a.e.c. in 1979 and 1980. In or about September *352 1980 she was assigned to the office of Werner Erhard within the est, a.e.c. organization as project manager and in 1981 she continued in that capacity for WEA. Myron A. Wick was manager of the office of Werner Erhard and then chief executive officer of est, a.e.c. during the period from 1980 until May 1981. In June 1981 he became chief executive officer of WEA until he resigned from WEA in September 1983. Brown Educational Corp. (hereinafter BEC) was formed in or about September 1981 as a holding company and an educational service company for sales organizations. BEC did not implement its stated purpose of acting as an educational service company. Am-Pro Marketing, Inc., (hereinafter Am-Pro) is a sales and marketing company primarily engaged in marketing a fuel additive product manufactured by Bell Laboratories in Florida. BEC filed a petition in bankruptcy in 1985 or 1986. Johnny Brown was president of both BEC and Am-Pro. Glenn J. Beadle was employed by Am-Pro as a motivational speaker and as the administrator of the company. Beadle was also an officer, director and shareholder of BEC. John D. Singleton, an attorney in Oklahoma, was retained by Am-Pro to perform tax-planning *353 services. In 1980 and 1981, Singleton, together with Beadle, consulted Margolis with respect to tax-planning. Kenneth H. Reiserer, a California attorney employed in the office of Harry Margolis from 1973 to 1976 and later from June 1977 to about January or February 1981, also participated in the tax-planning for Am-Pro. Am-Pro eventually entered into certain contractual arrangements suggested by the office of Harry Margolis involving Sineuri, S.A., and Truma, B.V. The Harry E. Wright, Jr., Charitable Trust was established on May 24, 1971, by Margolis pursuant to the will of Harry E. Wright, Jr. John E. Thorne, a California attorney, was a trustee of the Harry E. Wright, Jr., Charitable Trust. The First National Bank of Boston, Panama, was a branch of the First National Bank of Boston, a national bank chartered in the United States. Margolis, in the implementation of his tax planning for clients over the years, devised orchestrated cash flows or money movements that were structured by contractual arrangements. To create these money movements, Margolis on occasion would obtain the use of certificates of deposit for a fee from est, a.e.c. for a few days to use as collateral in *354 obtaining the temporary use of funds for the money movements. When the cash flow was completed, usually in a brief period of time, the collateral was released and the certificates were returned to est, a.e.c. Generally, transaction requests and check requests were used in the office of Harry Margolis to implement pre-arranged money movements. Transactions involving money movements would be accumulated and executed at the same time. These transactions would be coordinated by a designated employee in the office of Harry Margolis. In March 1980, Pat Dillan, an administrator in the chief executive office of est, a.e.c., conducted a survey of the advisory board of est, a.e.c. to ascertain, inter alia, the attitudes of the board members toward the legal and financial structure of est, a.e.c. In August 1980, the board members were apprised of the results of the survey, which emphasized the view that the complexities of the legal and financial structure of est, a.e.c. was difficult to understand and engendered skepticism from the public. In late 1979 or 1980 est, a.e.c. retained Deull (see supra p. 11), who in conjunction with the ongoing "create est anew" project, undertook to *355 investigate the legal and financial structure of est, a.e.c. and to explore the various legal and financial aspects of a transition from est, a.e.c. to a new organization. Deull, in additions to his legal services for est, a.e.c., also performed personal legal services contemporaneously for Werner and Ellen Erhard. He ceased representing est, a.e.c. in January 1981 and began representing WEA in February 1981. He continued to represent WEA until October 1984. Deull was a member of the est, a.e.c. advisory board which consisted of approximately 50 professionals and individuals who had participated in programs delivered by est, a.e.c. During the pendency of the criminal case involving Margolis, Deull expressed to Werner Erhard the view that the structure created for est, a.e.c. by Margolis was unduly complicated, confusing and anti-ethical to the work conducted by Werner Erhard and that the association with Margolis would, with respect to certain segments of the community, have a negative impact on the growth potential of est, a.e.c. The est, a.e.c. executives were also dissatisfied with the involvement by Margolis in the management and operation of est, a.e.c. Margolis was made *356 aware of the task team and his cooperation was sought in providing information and materials necessary for the completion of the investigation. Margolis was also informed of the retention of Deull, van Merkensteijn and Seth Hufstedler, an attorney, as outside legal counsel for est, a.e.c. and of the intention to eventually relieve the Margolis office of any ongoing responsibility. The initial offer of Margolis to resign immediately from the est, a.e.c. account was rejected by Deull. Deull retained John van Merkensteijn, an attorney, to analyze the tax aspects of the existing legal structure of est, a.e.c., to recommend a future structure for the ongoing business operation and to recommend suitable methods for the transition to the new structure. One of the concerns of van Merkensteijn was the avoidance of any transferee liabilities resulting from the transfer of assets from est, a.e.c. to any new business organization. John van Merkensteijn was subsequently retained as counsel by est, a.e.c. On April 25, 1981, he resigned as counsel to est, a.e.c. William C. Gifford, an attorney, was contacted by van Merkensteijn in 1980 to assist in the tax aspects of the transition form est, *357 a.e.c. to a new entity. Gifford later became the personal attorney for Werner Erhard and Ellen Erhard and, on or about April 25, 1981, he became tax counsel for WEA. During the spring and summer of 1980, Deull and other attorneys examined possible ways of reorganizing the est, a.e.c. enterprize. Among the alternatives they considered were a sole proprietorship, a corporation and a combination of a sole proprietorship with a section 501(c)(3) organization. In August 1980, Deull and van Merkensteijn recommended to Werner Erhard and the est, a.e.c. executives that Erhard should conduct the enterprise in the future as a sole proprietorship. In a memorandum to Werner Erhard dated September 16, 1980, Deull and van Merkensteijn explained their recommendation as follows: * * * The difficulty with the present situation is that it is (1) technically complex, (2) difficult, if not impossible to explain or understand and (3) subject to both public criticism and litigation with the Internal Revenue Service. Overall, many perceive it as acting as a barrier to your effectiveness. If we intend to deal the death blow to these perceptions and problems, we want a legal and financial structure *358 which is simple, easy to explain and honest, one which can be understood by anyone and which is morally right, ethical and consistent with purpose. If we have no intention or purpose to be at loggerheads with the tax system, the structure should be one in which substance and form are the same, in which both truth and reality correspond, which expresses the quality of integrity, and which not only permits you and the organization to function without hindrance but facilitates such functioning. From the tax point of view, the reflection of your perceived intention will be through one of three alternative structures: 1. no structure (everything in a sole proprietorship and fully subject to tax); 2. everything in a charitable organization and not subject to tax; 3. a coordinated combination of (1) and (2). Choice (1) from the tax point of view is truly participating in a death blow to the current organizational ethic that beating the tax system is the objective of "planning" and a necessity for survival. This puts no box around any activities, is consistent with you as source, supports and allows everything you have said you intend or want to do to happen without hindrance. *359 While it may not be easy or even possible to get there, it is the direction in which we believe you should go. As we discussed on August 19, it has non-tax considerations which are that you will be seen to be making the money (although you can avoid being seen to be wealthy by giving it away) and it will be inconsistent with previous public statements (such as the 1976 Legal-Financial Letters) and these may effect your ability to accomplish and contribute.
In the September 16, 1980, memorandum to Werner Erhard, the attorneys also stated: The existing legal and financial structure of est is and has been consistent with your intention to own est by giving it away; a structure consistent with your desire not be seen to be "in it for the money" while maximizing your ability to expand your contribution to people's well-being and the transformation of the quality of their lives. * * * In our paradigm, it is only possible to either be seen making the money and therefore being able to dispose of it, or not to be seen making the money and not being able to dispose of it or having it; and it is not possible within our system not to be seen making the money and having control or *360 power to dispose of it. That option only exists in the present situation and, of course, leaving everything essentially as it is, is a choice that can still be made.
In October 1980, a discussion group of some six tax attorneys, including Gifford, which had been formed by van Merkensteijn in the mid-1970s, met in the Franklin House in San Francisco. A topic of discussion was the restructuring of the business operations of est, a.e.c. and how Werner Erhard and the business enterprise could leave the Margolis system. The consensus of the group was that the association of Margolis with est, a.e.c. was a commercial impediment to the operation of the enterprise, that a purchase of the business assets from est, a.e.c. for fair market value was the best vehicle for obtaining the needed assets to continue the business operations in a new form, and that a sole proprietorship was the best alternative for enabling Werner Erhard and the enterprise to operate free of Margolis. The recommendation of Deull and van Merkensteijn to continue the enterprise as a sole proprietorship was accepted by Werner Erhard and the est, a.e.c. management with the expectation that the est, a.e.c. management *361 and employees would become employees of the sole proprietorship. John van Merkensteijn advised that a valuation of the business and the assets of est, a.e.c. should be obtained. A Settlement and Consulting Agreement was entered into by est, a.e.c. and Werner Erhard effective as of December 31, 1980, pursuant to which Erhard terminated his employment relationship with est, a.e.c., entered into a consulting agreement with est, a.e.c. and confirmed the retention by Erhard of his individually owned programs which he had permitted est, a.e.c. to market and deliver. John van Merkensteijn did not know of the Barclays Kol back-to-back loan to Werner Erhard which was collateralized by the Werner Erhard Charitable Settlement. Van Merkensteijn recommended that the Body of Knowledge materials be devalued, notwithstanding the fact that est, a.e.c. had contracts with Welbehagen, B.V., to pay $ 1,000,000 a year for the Body of Knowledge. In June 1980, van Merkensteijn recommended that the personal assets held by systems entities be acquired by Werner Erhard personally. In view of the key role of Werner Erhard in the services offered by the est, a.e.c. organization, the departure of Erhard *362 together with some of his executives and trainers would deprive the est, a.e.c. organization of its capability to function and to produce income and would leave the organization with nothing other than real estate, rental obligations and a miscellany of hardware. WEA was formally established as a sole proprietorship under California law in February 1981. A series of agreements effective as of February 20, 1981, was entered into by WEA and est, a.e.c. which established interim arrangements governing the administration, marketing, consulting and employee service associated with the business of WEA. In large part, the agreements were intended to compensate est, a.e.c. for administrative services associated with the business of WEA, for program enrollment marketing services performed by est, a.e.c., and to compensate WEA for services by its employees for est, a.e.c. Eisenberg, director of finance of WEA, prepared interim accounting procedures for the sole proprietorship, established separate books and records and opened new book accounts. In planning the acquisition of the est, a.e.c. assets by Werner Erhard, attorneys van Merkensteijn, Gifford and Deull recommended in April 1981 *363 that Werner Erhard acquire the assets through leases. In a memorandum dated April 23, 1981, to Margolis, counsel included this recommendation in a list of some 18 steps to accomplish the transfer of the est, a.e.c. assets to WEA. On or about April 25, 1981, the lease plan was presented to the est, a.e.c. executives by van Merkensteijn. The executives rejected the lease plan largely because of concerns over an insufficient cash flow to meet the required lease obligations. An alternative approach calling for the purchase of the assets from est, a.e.c. was then considered by the executives. Margolis supported the purchase alternative and suggested that the assets could be purchased with funds borrowed at low cost and with no interest. It was deemed essential by the parties to complete the purchase by the end of May prior to the start of the high revenue period, June through September. On or about April 25, 1981, Gifford replaced van Merkensteijn and assumed responsibility as outside tax counsel for WEA and Erhard personally. The final decision to adopt the asset purchase plan was reached by WEA about the middle of May 1981. In accomplishing the transfer of est, a.e.c. assets *364 to WEA, the attorneys Gifford, van Merkensteijn and Deull made other recommendations which were not followed by WEA. Counsel recommended that WEA not purchase the existent rights to the Body of Knowledge held by est, a.e.c. or by any other party. However, WEA agreed to purchase the Body of Knowledge. Counsel recommended that the Werner Erhard Charitable Settlement contribute its ownership of est, a.e.c. to a domestic section 501(c)(3) organization. However, at the completion of the asset transfer to WEA, Margolis and his system entities were left in control of est, a.e.c. In addition to the assets acquired by WEA from est, a.e.c. needed for WEA to operate its business, WEA also purchased personal assets for Werner Erhard, such as the auxiliary sloop, Sirona, from Associated Advisors. Associated Advisors had previously purchased, in addition to the Sirona, an automobile to be used by Werner Erhard, held the unrecorded mortgage on the home of Werner Erhard, had made loans to Werner Erhard, and had provided funds to Werner Erhard for use in the so-called Breakthrough racing activities in or about 1979. WEA also purchased art works from the Werner Erhard Charitable Settlement during *365 the period of the asset transfer from est, a.e.c. to WEA in 1981. Gary Grace was financial officer for est, a.e.c. at the time he left the organization in 1979. In late 1979 or early 1980, Werner Erhard retained Gary Grace to conduct an investigation of Erhard Seminars Training and est, a.e.c. and the system accounting in order to ascertain the financial situation of both entities as well as the personal financial situation of Werner Erhard vis-a-vis the Margolis system. Grace was given access to all financial records and files in the office of Harry Margolis which pertained to the entities Erhard Seminars Training, Inc., and est, a.e.c. as well as to Werner and Ellen Erhard in their individual capacities. In his analysis of these records, Gary Grace did not separate the entities and the individuals involved. In his investigation, Grace traced funds going into the system and coming out of the system. Funds moving between system entities were not recorded in systems accounting and Gary Grace was not concerned with such movements of funds. Since the investigation entailed a study of all the relevant records at the Margolis office, Gary Grace conducted the investigation in the *366 capacity of consultant to Margolis. The records examined included the records of Erhard Seminar Training, est, a.e.c., and the records pertaining to Ellen and Werner Erhard. At some point, at the insistence of Deull, Gary Grace continued the investigation under a fee arrangement with the Deull law firm. In all, the entire project conducted by Gary Grace lasted over a period of some nine months. Grace determined that all amounts paid by est, a.e.c. during the relevant period into the Margolis system were properly recorded as receipts in the Erhard system accounting. Gary Grace also determined that these payments by est, a.e.c. into the system were expended for the benefit of Werner Erhard and est, a.e.c. After September 1, 1975, est, a.e.c. made interest and principle payments to Welbehagen, B.V., and also made payments of legal fees and costs to Margolis. These amounts were credited to the Erhard accounting. Payments from Werner Erhard Charitable Settlement to est, a.e.c. (generally as capital contributions) were charged to the Erhard accounting. Payments from Werner Erhard Charitable Settlement to purchase art were charged to the Erhard accounting. Payments from Associated *367 Advisors to purchase the auxiliary sloop, Sirona, were charged to the Erhard accounting. Payments from Welbehagen, B.V., to pay for Werner Erhard's travel expenses on a Bali/India trip and his sabbatical expenses were charged to the Erhard accounting. Payments from Associated Advisors to purchase a Porsche automobile for Werner Erhard and to pay his automobile racing expenses were charged to the Erhard accounting. Payments from Welbehagen, B.V., to finance deficits of the foreign operations of est, a.e.c. were charged to the Erhard accounting. Payments made from the Werner Erhard Charitable Settlement for donations by Werner Erhard were charged to the Erhard accounting. On occasion, the system made back-to-back collateral deposits for loans to est, a.e.c. The result of the analysis performed by Gary Grace was recommendations and questions to be resolved as to the system accounting. In 1982 Werner Erhard and Margolis entered negotiations concerning outstanding balances due between the parties. A settlement was eventually reached in which no payments were required by either party. On or about May 22, 1981, Teague, an employee of Margolis, was given a special power of attorney *368 by the Parallax Corp., empowering her to open a bank account for Parallax Corp., with Barclays Bank of San Francisco, to pledge funds in the Parallax Corp., account to secure a loan or loans made by the bank to Werner Erhard or WEA, and to perform other functions related to this specific transaction. On June 1, 1981, Parallax Corp., provided general security agreements to Barclays Bank of San Francisco and Barclays Bank International, Ltd., to secure the loans to WEA. In a memorandum termed "cash flow" dated May 20, 1981, Margolis advised Michael Eisenberg, who had the responsibility for drawing checks and arranging transfers of funds for WEA, on aspects of the financing and the various transactions associated with the transfer of operations from est, a.e.c. to WEA in mid-1981. Check requests and cash receipt forms, which were generally employed by the office of Harry Margolis in documenting cash flows and money transfers in its tax-planning transactions, were used in connection with aspects of the asset transfer in mid-1981 from est, a.e.c. to WEA. The transfer of assets in mid-1981 from est, a.e.c. to WEA involved the following money movements: 1. On May 27, 1981, WEA made *369 transfers of $ 16,000 and $ 250,000 to Associated Advisors. 2. On May 28, 1981, est, a.e.c. transferred $ 4,657,000 to Welbehagen, B.V. 3. On May 29, 1981, WEA transferred $ 100,000 to Alexia. 4. On May 29, 1981, WEA transferred $ 50,000 to PMSA. 5. On June 1, 1981, Parallax Corp., made separate transfers of $ 1,000,000 and $ 4,000,000 to Barclays Bank of San Francisco. 6. On June 1, 1981, Barclays Bank of San Francisco made a loan of $ 5,000,000 to WEA. The total of $ 5,000,000 transferred by Parallax Corp., to Barclays Bank of San Francisco on June 1, 1981, guaranteed the loan made by Barclays Bank of San Francisco to WEA. 7. On June 1, 1981, Terla, B.V., transferred $ 2,200,000 to WEA. 8. In June 1981 WEA transferred $ 2,706,792 to est, a.e.c. 9. On June 1, 1981, WEA transferred $ 1,602,847.22 to Barclays Kol in the Netherlands in repayment of a loan from Barclays Kol. 10. On June 2, 1981, Alexia transferred $ 610,000 to est, a.e.c. 11. On July 22, 1981, WEA transferred $ 765,038 to Alexia. 12. On August 27, 1981, est, a.e.c. made three transfers to Welbehagen, B.V., in the following amounts: $ 1,571,000, $ 1,000,000 and $ 2,000,000. 13. On August 27, 1981, *370 est, a.e.c. transferred $ 1,115,000 to Alexia. 14. On August 27, 1981, Alexia transferred $ 1,390,000 to est, a.e.c. 15. On August 27, 1981, Terla, B.V., made transfers of $ 2,300,000, $ 780,000 and $ 3,500,000 to WEA. 16. On August 27, 1981, WEA transferred $ 3,693,868 to est, a.e.c. 17. On August 27, 1981, WEA transferred $ 1,385,000 to Island Bank, Ltd., for the account of Welbehagen, B.V. 18. On August 27, 1981, WEA transferred $ 213,000 to est, a.e.c. for Associated Advisors. 19. On August 24, 1981, WEA made transfers to Antigua Banking, Ltd., in the amounts of $ 94,449.47, $ 342,829, $ 2,100,000 and $ 900,000. 20. On August 28, 1981, Antigua Banking, Ltd., transferred $ 3,000,000 to WEA. In the May 20, 1981, "cash flow" memorandum from Margolis to Eisenberg, Margolis indicated that when all the contemplated transactions were concluded, the cash position of est, a.e.c. would be reduced by $ 2,950,000 and the cash holdings of WEA would increase by the same amount. In 1977 or 1978, Barclays Kol made a loan of $ 1,000,000 to Werner Erhard. The Barclays Kol loan was secured by a back-to-back collateral deposit from the Werner Erhard Charitable Settlement. The Erhard *371 accounting in the Harry Margolis system of accounting was charged $ 1,000,000 for the Barclays Kol loan. The Erhard accounting was credited for interest earned for one year on the $ 1,000,000 collateral deposit made at Barclays Kol for the Barclays Kol loan. In his report to Deull dated June 13, 1980, summarizing his review of the financial interactions of the Harry Margolis office with Werner Erhard, est, a.e.c. and related entities Gary Grace recommended that interest for an additional year be credited to the Erhard accounting with respect to the $ 1,000,000 collateral deposit. Werner Erhard paid the interest on the Barclays Kol loan with bonus payments he received from Associated Advisors. In May and June 1981, WEA and est, a.e.c. entered into a series of agreements with respect to the acquisition by WEA of certain operating assets from est, a.e.c. These agreements involve the lease/purchase of assets at fair market values to be determined by independent appraisals. Additional agreements were also reached for the purchase by WEA of art works, an auxiliary sloop (the Sirona), the Body of Knowledge and certain quitclaims relating to the Body of Knowledge from Associated Advisors, *372 PMSA and the Werner Erhard Charitable Settlement. In implementing the documentation for the asset transfer in mid-1981 from est, a.e.c. to WEA, Margolis deemed it appropriate for Schreiber to make final decisions for est, a.e.c. as well as for WEA as to the documentation to be utilized. In a memorandum to Pat Dillan and William Gifford dated August 1, 1981, Margolis indicated that some $ 2,000,000 in assets involved in the asset transfer were handled without his involvement. Margolis also stated in the August 1, 1981, memorandum that he had no confidence in the appraisals used in connection with the asset transfer. By agreements dated May 15, 1981, est, a.e.c. leased to WEA certain personal property and leasehold improvements at locations throughout the United States and granted WEA an option to purchase the personal property leases and leasehold improvements. By agreement dated July 31, 1981, WEA exercised its option to purchase the personal property and leasehold improvements from est, a.e.c. On August 24, 1981, WEA paid $ 1,610,370.80 pursuant to this agreement. On May 15, 1981, est, a.e.c. and WEA executed some 32 agreements for the sale of existing real estate leases in *373 various states by est, a.e.c. to WEA at stated valuations. On July 31, 1981, WEA agreed to pay an additional $ 1,465,318 to est, a.e.c. for the 32 leaseholds in order to reflect the valuation subsequently determined for such leaseholds by an independent appraisal. By checks dated May 27, 1981, WEA paid $ 1,143,932 to est, a.e.c. for the acquisition of the 32 leases subject to adjustment upon receipt of independent appraisals at fair market values. On August 24, 1981, pursuant to the subsequent appraisals, WEA paid an additional $ 1,465,318 to est, a.e.c. On June 1, 1981, est, a.e.c. and WEA executed an agreement for the sale of graduate records from est, a.e.c. to WEA for the amount of $ 750,000. WEA also agreed to pay est, a.e.c. $ 250,000 for an agreement not to compete. The June 1, 1981, agreement also stated the following: The parties recognize that est may have accumulated certain rights with regard to certain programs owned by Werner Erhard and unrelated to the est Body of Knowledge. Such programs and materials related thereto were in part developed by est employees working under the general supervision of Werner Erhard, and such programs were marketed and promoted *374 by est for its own account. The parties desire to set at rest any question concerning ownership, the right to use, prior assignments, and all aspects of everything including materials related to such programs, which include the Communication Workshop, 6-day Training, 7-day training, assisting program, courses on Well-Being, consulting, relationships and all material offered on audiotapes. This agreement shall operate as an assignment and quitclaim pursuant to which all of the rights of est are hereby assigned and set over to WEA effective the 1st day of June, 1981, without reservations of any kind. est will join in the defense of any claims against such material asserted by anyone provided only that such activity shall be paid for by WEA. Any document required by WEA at anytime or for any purpose to carry out the intention of the parties to vest ownership of everything in WEA shall be executed by est provided only that any cost connected therewith shall be paid for by WEA. In specific consideration of this assignment and transfer of all est's interest, WEA has paid est the sum of $ 100,000.
On July 31, 1981, est, a.e.c. and WEA agreed to an adjustment in the sales price *375 previously reached for the graduate records in order to reflect the valuation of the property subsequently determined by an independent appraisal. On June 1, 1981, est, a.e.c. and WEA executed an agreement for the sale of miscellaneous items, including certain motor vehicles by est, a.e.c. to WEA. On July 31, 1981, est, a.e.c. and WEA agreed to an adjustment in the sales price previously determined for the motor vehicles and WEA agreed to pay an additional $ 36,900 to est, a.e.c. in order to reflect the valuation of such motor vehicles subsequently determined by an independent appraisal. On July 31, 1981, est, a.e.c. and WEA agreed to an adjustment in the sales price previously determined for the graduate records and est, a.e.c. agreed to pay $ 371,200 to WEA to reflect the valuation of the graduate records subsequently determined by an independent appraisal. An agreement between est, a.e.c. and WEA dated July 31, 1981, in which WEA agreed to exercise an option to purchase real property (the Franklin House in San Francisco) was made effective as of July 1, 1981. An agreement between est, a.e.c. and WEA dated July 31, 1981, in which WEA agreed to exercise an option to purchase *376 certain personal property located in various cities was made effective as of July 1, 1981. An agreement between est, a.e.c. and WEA dated July 31, 1981, in which WEA agreed to exercise an option to purchase certain computer hardware and software was made effective as of July 1, 1981. On May 29, 1981, WEA authorized payment to PMSA for the materials collectively called the Body of Knowledge. On June 2, 1981, PMSA executed a quitclaim document in favor of WEA with respect to the Body of Knowledge. On May 27, 1981, WEA issued a check to est, a.e.c. in the amount of $ 150,000 in payment for the Body of Knowledge material. On June 1, 1981, est, a.e.c. executed a bill of sale and quitclaim in favor of WEA for the Body of Knowledge material. In a letter to Margolis dated August 5, 1981, Alexia acknowledged receipt of a memorandum from Margolis dated July 17, 1981, together with a copy of an agreement of sale of certain art works by the Werner Erhard Charitable Settlement, to WEA. The August 5, 1981, letter also referred to an enclosed executed copy of the agreement of sale. The sales agreement for the art work recited that it was entered into on June 1, 1981. In the course of the *377 transfer of the assets of est, a.e.c. to WEA in mid-1981, Gifford had regular and frequent dealing with Margolis. Gifford agreed to the request of Margolis that the officers of est, a.e.c. who had become officers of WEA would stay on as officers of est, a.e.c. as the nominees of Margolis in the implementation of the various agreements between est, a.e.c. and WEA. The role of Margolis as the source of the funds required in the asset acquisition transaction was recognized by Werner Erhard as well as his agents and his legal representative in the various stages leading up to the September 1981 asset transfer transaction. Margolis proposed a variety of alternatives to Werner Erhard and his legal counsel for the routing of the cash flows to effectuate the asset acquisition by WEA. Margolis agreed to arrange short-term interim financing for WEA for 60 to 90 days at market interest rates. Margolis arranged a loan from Barclay Bank of San Francisco to WEA. On or about May 29, 1981, WEA borrowed $ 5,000,000 from Barclays Bank of San Francisco for a period of 90 days at 19-7/8 percent interest. WEA gave the bank a promissory note and general security interest for the loan. Parallax *378 Corp., provided a guarantee for the loan of $ 5,000,000 made by Barclays Bank of San Francisco to WEA. On June 1, 1981, WEA also obtained short-term financing of $ 2,200,000 from Terla, B.V., on an open account loan at 20 percent interest. By agreement dated June 1, 1981, WEA agreed to purchase from est, a.e.c. certain miscellaneous items, including motor vehicles, for $ 20,000. By agreement dated July 31, 1981, WEA agreed to pay to est, a.e.c. an additional $ 36,900 for the motor vehicles based upon an independent appraisal. On December 31, 1981, WEA paid to est, a.e.c. the amount of $ 347,815 representing a part of the improvements to a certain property referred to as Mountain Lake Manor; $ 329,145 for security and rental deposits on leased offices; and an additional $ 730,473 for other miscellaneous items acquired from est, a.e.c. including prepaid accounts for insurance, taxes, notes receivable, employee advances and wine inventory. On June 1, 1981, est, a.e.c. agreed to lease the Franklin House to WEA with an option to purchase. On July 31, 1981, WEA exercised its option to purchase the Franklin House from est, a.e.c. for $ 725,000 based on the valuation of an independent *379 appraiser. On June 1, 1981, est, a.e.c. leased to WEA certain computer equipment and software with an option to purchase. On July 31, 1981, WEA exercised its option to purchase the computer equipment and software for $ 272,470 based on the valuation of an independent appraiser. Pursuant to an agreement dated June 1, 1981, WEA made the following payments to est, a.e.c.: (1) $ 750,000 for graduate records; (2) $ 250,000 pursuant to a non-competition clause; (3) $ 100,000 for certain residual rights; and (4) $ 10,000 for goodwill. On July 31, 1981, WEA and est, a.e.c. agreed to readjust the purchase price for the graduate records to reflect an independent appraisal of the value of such records. On August 27, 1981, est, a.e.c. repaid $ 371,200 to WEA representing the reduction in the purchase price of the graduate records. On June 22, 1981, est, a.e.c. agreed to assign to WEA its rights in a contract for land and building in Royal Oak, Michigan. On December 22, 1981, WEA paid est, a.e.c. $ 140,212.60 for the land contract plus interest. By agreement dated June 1, 1981, the Werner Erhard Charitable Settlement agreed to sell to WEA certain works of art for $ 865,038. WEA paid this *380 amount in full by July 22, 1981. Pursuant to an agreement executed June 2, 1981, WEA paid $ 50,000 to PMSA for a quitclaim to any right, title and interest held by PMSA in the Body of Knowledge. By agreement dated June 1, 1981, WEA paid $ 150,000 to est, a.e.c. for a quitclaim to any right, title and interest held by est, a.e.c. as licensee in the Body of Knowledge. By agreement dated July 1, 1981, WEA paid $ 1,385,000 to Welbehagen, B.V., for its right, title and interest in the Body of Knowledge. By agreement dated June 1, 1981, WEA paid $ 50,000 to est of India for its right, title and interest in the Body of Knowledge. By agreement dated June 1, 1981, WEA, in return for a payment of $ 20,000.00 and a credit of $ 30,000 against future WEA billings, acquired from est of England its right, title and interest in the Body of Knowledge. By agreement dated June 1, 1981, WEA, in return for the allowance of a $ 50,000 credit against future WEA billings, acquired from est of Canada its right, title and interest in the Body of Knowledge. By agreement dated May 15, 1981, Associated Advisors leased the auxiliary sloop Sirona to WEA with an option to purchase. By agreement dated July *381 1, 1981, WEA exercised its option to purchase the Sirona for the appraised value of $ 225,000. The Sirona had been used by Werner Erhard for business and pleasure while he was an employee of est, a.e.c. On June 1, 1981, WEA paid $ 1,062,847.22 to Barclays Kol in payment of the principle and interest on an outstanding loan to Werner and Ellen Erhard. On June 1, 1981, Werner and Ellen Erhard entered into an accord and satisfaction agreement with Associated Advisors upon payment of $ 250,000 to Associated Advisors in satisfaction of all notes and obligations of Werner and Ellen Erhard, including a mortgage on their residence. On August 24, 1981, WEA purchased for $ 94,449 certain loans from Antigua Banking, Ltd., to third parties who were to become employees of WEA. On June 26, 1981, WEA paid $ 215,000 to Werner Erhard, and on the same date Werner Erhard made a contribution in the same amount to an entity called Breakthrough Foundation. The total loan proceeds of $ 7,200,000 obtained from Barclays Bank of San Francisco and Terla, B.V., were used by WEA as follows: (1) $ 2,249,323 retained by WEA as working capital; (2) $ 2,706,792 paid to est, a.e.c. for real estate leases ($ 1,143,932), *382 personal property in the leased offices ($ 199,360), a deposit on the Franklin House building ($ 50,000), a deposit on computer hardware and software ($ 33,500), graduate records ($ 750,000), a non-competition agreement ($ 250,000), a quitclaim of rights in the Body of Knowledge ($ 150,000), a quitclaim of rights in separate property ($ 100,000), goodwill ($ 10,000) and motor vehicles ($ 20,000); (3) $ 865,000 paid to Alexia for art works; (4) $ 50,000 paid to PMSA for a quitclaim of rights in the Body of Knowledge; (5) $ 1,062,847 paid to Barclays Kol to repay the principal and interest on a loan to Werner Erhard and Ellen Erhard; (6) $ 16,000 paid to Associated Advisors as a deposit on the auxiliary sloop Sirona; and (7) $ 250,000 paid to Associated Advisors as a loan repayment. As of June 1, 1981, WEA took over all of the business operations formally conducted by est, a.e.c., including the seminars, the 6-day training and the est standard training. Substantially all the employees of est, a.e.c. became employees of WEA. Generally, Werner Erhard continued the same basic work in the operations of WEA that he had performed prior to June 1, 1981, with est, a.e.c. In a June 19, 1981, *383 memorandum from Gary Grace to Margolis, Gary Grace forwarded a list of outstanding loans to Werner Erhard from Antigua Banking, Ltd. The series of loans over a period from about September 20, 1980, through about May 8, 1981, were in a total amount of $ 308,500. The memorandum referred to a request from Werner Erhard to have the outstanding loans repaid through WEA by increasing the ultimate loan to WEA by a like amount. During the clean-up phase of est, a.e.c. in 1980 and 1981, Margolis advised against the preparation of documents that could jeopardize the defense of past tax planning. At the conclusion of the clean-up phase in 1981, est, a.e.c. was left in the control of Margolis and his system entities. In an agreement effective as of June 1, 1981, Am-Pro obtained an option to acquire from Alexia all of the stock of est, a.e.c. In August 1981, Am-Pro notified Alexia of its decision not to acquire the est, a.e.c. stock pursuant to the option agreement. Wolfgang Somary is a banker in Switzerland. He is a member of the board of the EBC (European Banking Company) Switzerland Ltd., Corp., and is also a partner and director of STA Salmann Trust of Valduz, an asset management company. *384 Upon his father's death, Somary took over his father's private bank, Blankart & Company. Somary merged Blankart & Company into a larger Swiss private bank, Bank Sarasin, where he was a managing director and limited partner until 1985. Somary was also a co-founder in 1974 of ICF, a tax-exempt organization under Swiss law. The purpose of the foundation was to pave the way to new forms of thinking and education and to engage in cross-cultural research. ICF is required to file annual reports with the Swiss Federal Ministry of the Interior. The books and records of ICF are audited on an annual basis by a Swiss accounting firm. In April 1981, Werner Erhard telephoned Somary to explain the formation of WEA and also to inform Somary of the need for a loan of about $ 9,000,000 - $ 10,000,000. Somary was unable to provide the funds. Shortly thereafter, Somary was called by Margolis who inquired whether Erhard had contacted Somary about the need for financing and whether ICF would be willing to accept funds made available by an entity designated by Margolis and to then lend such funds to the Werner Erhard organization. In May 1981 Somary notified Erhard that he would be willing to finance *385 a loan to WEA pending further arrangements. Margolis subsequently notified Somary that he had located a source of funds in the amount of $ 14,000,000. Fernando Flores is a retired Costa Rican diplomat and the Legate for the Americans of the Sovereign Order of the Hospital of St. John of Jerusalem in Denmark. In 1981 Flores was co-founder of St. John Fundacion, a non-profit foundation for humanitarian, educational, charitable and social purposes. Werner Erhard contacted Flores to explain the need for the financing of the asset acquisition by WEA. Subsequently, Margolis contacted Flores to inquire whether he had been contacted by Werner Erhard and whether he would be willing to make a loan to Erhard if such funds were available. Flores expressed his willingness to do so. Margolis wanted both ICF and St. John Fundacion to participate in the loan to Erhard. The loan to Erhard which was eventually made was in the amount of $ 14,000,000. Gifford regarded a fully disclosable source of the $ 14,000,000 to Erhard as essential to an acceptable asset acquisition plan. In a memorandum dated July 31, 1981, Erhard was informed by Gifford that on July 18, 1981, Margolis had indicated that, *386 with respect to the source of funds needed for the asset acquisition by WEA, "The truth is that there is no source other than the accumulated values of the past decade." On September 9, 1981, Erhard requested that an account be opened for him designated as d/b/a WEA at FNBBP with an initial deposit of $ 500. On July 12, 1982, this account at FNBBP (indicating a balance of $ 500) was closed. On September 10, 1981, Wolfgang F. Somary requested that an account be opened for ICF at FNBBP with an initial deposit of $ 500. On September 15, 1981, Everd B. van Walsum requested that a personal account be opened for him at FNBBP. Everd B. van Walsum informed Fernando Flores while in Panama that he would represent ICF in the September 1981 banking transactions involving the transaction which did not pass through his account at FNBBP but, instead, went through the account opened at FNBBP by van Walsum. On September 15, 1981, Mason requested that a personal account be opened at FNBBP designated as Mason for St. John Fundacion. The account was closed in 1985 when donations from ICF ceased. By letter dated September 9, 1981, to FNBBP, WEA instructed FNBBP that upon receipt from ICF on or *387 about September 15, 1981, of funds in the amount of $ 14,000,000, to immediately transfer such funds to an account opened by WEA at Island Bank, Ltd. The September 9, 1981, letter to FNBBP was signed by Werner Erhard. By letter to Island Bank, Ltd., dated September 9, 1981, WEA instructed Island Bank, Ltd., that immediately upon deposit in the WEA account of $ 14,000,000, Island Bank, Ltd., was instructed to pay to Barclays Bank of San Francisco the $ 5,000,000 loan due from WEA and to pay the balance of $ 9,000,000 to Erik Holding, B.V. The September 9, 1981, letter to Island Bank, Ltd., was signed by Werner Erhard. The September 9, 1981, letter from WEA to FNBBP was drafted on the basis of information provided by the office of Harry Margolis. On September 10, 1981, ICF and BEC executed an Agreement and Instructions, which had been drafted by Margolis, with respect to the processing of the contemplated $ 14,000,000 loan: This agreement is executed by Wolfgang F. Somary, acting as director of the Intercultural Cooperation Foundation, established under the laws of Switzerland, hereinafter referred to as Foundation, and Brown Educational Corporation, an Oklahoma corporation, *388 hereinafter referred to as BEC. Witnesseth Whereas BEC intends to make fourteen million dollars ($ 14,000,000.00 U.S.) available to Foundation, and whereas Foundation wishes specific instructions with regard to such funds, now therefore, in consideration of the premises, it is hereby agreed: 1.) The fourteen million dollars ($ 14,000,000.00 U.S. Dollars) which is the subject of this agreement will be made available to Foundation at the First National Bank of Boston, Panama City, Panama, by deposit by BEC to the account of Foundation. 2.) Foundation is instructed to transfer such fourteen million dollars ($ 14,000,000 U.S.) to the account of the Fundacion Soberana Orden de San Juan de Jerusalem in Costa Rica, a charitable entity organized under the laws of Costa Rica, hereinafter referred to as St. John, at the First National Bank of Boston in the same branch. 3.) Foundation is instructed to obtain a note from St. John in a form satisfactory to Foundation. Foundation shall not be responsible for the genuineness of the signatures on such note, nor for the failure of St. John to deliver. * * * 4.) Foundation shall retain possession of such note. Foundation shall endorse *389 and deliver such note to BEC at any time that the note may be in default, provided that BEC shall give Foundation ninety (90) days' written notice requesting the endorsement and delivery of such note and provided further that such default shall continue through the entire 90 day notice period. Upon delivery of such endorsed note. Foundation shall have no further obligation hereunder other than to assist BEC in any reasonable request related to the total situation. Provided only that all expenses in connection with any such request shall be paid for by BEC. The note shall be endorsed without recourse when as and if delivered by Foundation to BEC. 5.) No assignment of this agreement shall be made by either party without the express prior written consent of the other. 6.) All proceeds of the note, exclusive only of the principal, shall be the property of Foundation and BEC shall make no claim thereto. Any portion of principal received by Foundation at any time shall be immediately transferred to BEC.
On September 10, 1981, ICF and St. John Fundacion executed an Agreement and Instructions, which had been drafted by Margolis together with Somary and Flores, with respect *390 the processing of the contemplated $ 14,000,000.00 loan: This document is executed by the Intercultural Cooperation Foundation of Zurich, Switzerland, hereinafter referred to as Foundation, and the Fundacion Soberana Orden de San Juan de Jerusalem of Costa Rica, hereinafter referred to as San Juan. Witnesseth: Whereas Foundation intends to deposit Fourteen Million Dollars ($ 14,000,000 U.S.) to the account of San Juan, and whereas San Juan requests instructions with reference to the disposition of said sum: now, therefore, in consideration of the premises, it is hereby agreed: 1.) Foundation will deposit fourteen million dollars ($ 14,000,000) to the account of San Juan at the First National Bank of Boston, Panama City, Panama, on September 15, 1981. 2.) Said sum is intended to constitute a restricted loan and grant by Foundation to San Juan, as herein set forth. 3.) The parties share goals and aspirations in a broad range of human affairs. They intend that the fourteen million dollars ($ 14,000,000 US) shall be made available to Werner Erhard, doing business as Werner Erhard and Associates, for a period of ten (10) years. A form of non-negotiable promissory note *391 has been provided by Foundation to San Juan. Such note shall be executed by Werner Erhard and Associates when San Juan delivers the fourteen million dollars ($ 14,000,000 US) to Werner Erhard. Immediately thereafter San Juan shall endorse and deliver such note to Foundation. Such endorsement may be without recourse. 4.) The annual interest payable of $ 280,000 (two hundred eighty thousand U.S. Dollars) shall be utilized exclusively for charitable and educational purposes. The parties understand that the holder of the note will have sole legal discretion with reference to the selection of the projects to be funded. Initially, Foundation contemplates utilizing twenty five thousand dollars ($ 25,000 US) for the direct purposes of the Foundation. Foundation contemplates that thirty thousand dollars ($ 30,000 US) shall be made available to the Order of St. John of Jerusalem in Denmark. With reference to the balance, Foundation contemplates distribution to San Juan for work in Central America in the areas of peace, hunger, education and public health. 5.) No assignment of any portion of this Agreement may be made without the express prior written approval of both parties.
*392 By letter to FNBBP dated September 9, 1981, Erhard advised the bank that a $ 14,000,000 deposit was expected to be made to his account on September 15, 1981, and directed the bank to transfer that amount to Island Bank, Ltd., for the account of WEA. By letter dated September 9, 1981, to Mason, managing director of Island Bank, Ltd., Erhard instructed Island Bank, Ltd., to transfer the $ 14,000,000 as follows: $ 8,976,284.95 to Erik Holding, B.V., and $ 5,035,972.34 to Barclays Bank of San Francisco. The reference in the letter to Erik Holding, B.V., was a mistake; the transfer of $ 8,976,284.95 was to be made to Terla, B.V. Erhard closed the account of WEA at FNBBP in July 1982. By letter dated September 5, 1981, to FNBBP, St. John Fundacion requested the opening of a bank account in its name and made an initial deposit of $ 500. On the recommendation of Margolis, Flores (St. John Fundacion) authorized Mason to bank at FNBBP as an agent for St. John Fundacion. On September 15, 1981, Mason provided FNBBP with an authorization letter from ICF to transfer $ 14,000,000 to St. John Fundacion and a letter of instructions from St. John Fundaction requesting the transfer of the $ 14,000,000 *393 to the account of WEA at the bank. On September 15, 1981, ICF, through St. John Fundacion, made a loan of $ 14,000,000 to Werner Erhard and his sole proprietorship. On September 15, 1981, Werner Erhard individually and for WEA executed a non-negotiable note in the amount of $ 14,000,000 due and payable to St. John Fundacion on August 31, 1991, at Barclays Bank of San Francisco. The note specified interest of two percent per annum. The note stated that St. John Fundacion intended to endorse the instrument to ICF, and said endorsement to ICF was accordingly made by St. John Fundacion effective September 15, 1981. The note provided as security substantially all of the assets of WEA, as well as the proceeds from any disposition thereof. The security, however, was subordinated to any indebtedness of WEA incurred in its business and any security interest related thereto. The proceeds of the $ 14,000,000 loan from ICF on September 15, 1981, were used to repay the short-term financing from Barclay Bank of San Francisco and Terla, B.V. Upon the suggestion of Margolis, Somary issued instructions for the delivery of the $ 14,000,000 note to Island Bank, Ltd., for safekeeping. Everd *394 van Walsum acted as trustee on behalf of ICF in the banking transactions that took place on September 15, 1981. The role of St. John Fundacion was to receive a conditional grant loan of $ 14,000,000 from ICF and, in turn, to loan this amount to WEA. Flores did nothing to insure that the $ 14,000,000 loan would be repaid by Werner Erhard. Flores understood that it was the responsibility of ICF to insure repayment of the note in view of the endorsement by Flores of the note back to ICF. After Somary and Margolis discussed the opening of a bank account for ICF at FNBBP, Somary suggested to Flores that the pending banking transaction involving the money transfer should take place at FNBBP rather than in Costa Rica. Margolis recommended Mason to Flores as one who could assist Flores in the banking transaction at FNBBP. Mason did in fact act on behalf of St. John Fundacion at FNBBP. The Werner Erhard promissory note in the amount of $ 14,000,000 was secured by the assets of Erhard. However, the note instruments removes the Franklin House in San Francisco as security and also subordinated the loan to the obligations which might arise in the ordinary course of business. The value *395 of the security for the note obligation was indeterminable. Under Swiss law, the collateral provisions in the note instrument were enforceable only with respect to assets located in Switzerland. In 1984, Somary allowed WEA to substitute other collateral for the graduate list in the event of any default on the promissory note. At the time ICF made the loan of $ 14,000,000, Somary knew that a balance sheet for WEA as of August 31, 1981, showed a negative net worth. On September 15, 1981, van Walsum provided documentation to FNBBP to open a trustee account designating van Walsum to act for ICF. This account was then credited with $ 14,000,000 on September 15, 1981, from BEC. On September 15, 1981, FNBBP notified Erhard that $ 14,000,000 had been debited from his account and credited to the account of Island Bank, Ltd., at FNBBP per Erhard's instructions. By letter dated September 15, 1981, Erhard received confirmation of the transfer from the account of Island Bank, Ltd., of $ 8,976,284.95 to Terla, B.V. On September 15, 1981, $ 5,023,500 was credited to the WEA account at Barclays Bank of San Francisco. WEA then paid $ 5,035,972.23 to Barclays Bank of San Francisco. WEA paid *396 ICF the required interest payments on the $ 14,000,000 note and withheld the statutory 5 percent withheld tax on such payments made to foreign persons. ICF obtained the $ 14,000,000 from BEC an entity which had been formed in or about September 1981 as part of the tax planning of Margolis and Reiserer. A condition to ICF's agreement to receive funds from BEC was that ICF would not be liable to BEC in the event WEA defaulted on the loan. BEC obtained the $ 14,000,000 which it loaned to ICF from Sineuri, S.A., a Panamanian company. In 1981, BEC had cash assets in the amount of $ 1,000. Although Beadle was an officer and director of BEC, the transfer of $ 14,000,000 in September 1981 to ICF was not discussed with him and he was not aware of such transfer. Generally, Singleton and Reiserer conducted the BEC board of directors meetings in 1981 and presented documents to the board of directors for their signatures. In 1981 BEC received $ 15,000,000 from Sineuri, S.A., and, at the request of Margolis, BEC transferred $ 14,000,000 to ICF. Margolis was responsible for the arrangements between BEC and ICF with respect to the $ 14,000,000 transfer. Johnny Brown executed the documents *397 relating to the transfer of $ 14,000,000 to ICF pursuant to instructions from Reiserer. BEC subsequently assigned to Island Bank, Ltd., all right, title and interest in the $ 14,000,000 promissory note from ICF. As of September 14, 1981, the balance in the Island Bank, Ltd., account at Barclays Bank of San Francisco was $ 40,088.42. On September 15, 1981, Island Bank, Ltd., deposited $ 125,804,000 in its account at Barclays Bank of San Francisco. This was accomplished through a series of transfers. The sources of the deposits into the Island Bank, Ltd., account at Barclays Bank of San Francisco were transfers from Barclays Bank of San Francisco and various partnerships formed by Margolis and used by him in his tax planning. On September, 15, 1981, Island Bank, Ltd., transferred $ 125,803,410 out of its account at Barclays Bank of San Francisco. The transfer of said amount on September 15, 1981, was made by Island Bank, Ltd., to Barclay Bank of San Francisco and to the account of Island Bank, Ltd., at FNBBP. The balance in the Island Bank, Ltd., account at Barclays Bank of San Francisco as of September 15, 1981, was $ 40,738.42. On September 15, 1981, Island Bank, Ltd., transferred *398 $ 96,000,000 from its account at FNBBP to the account of Sineuri, S.A., at FNBBP. On the same date, Sineuri, S.A., transferred $ 15,000,000 from its account at FNBBP to the account of BEC at FNBBP. On September 15, 1981, BEC transferred $ 14,000,000 from its account at FNBBP to ICF through an account in the name of Everd van Walsum at FNBBP. On September 15, 1981, BEC transferred $ 1,000,000 from its account at FNBBP to the account of Island Bank, Ltd., at FNBBP. On September 15, 1981, ICF transferred $ 14,000,000 from its account at FNBBP to St. John Fundacion through an account at FNBBP in the name of Paul Mason. On September 15, 1981, St. John Fundacion transferred $ 14,000,000 from its account at FNBBP to the account of Werner Erhard & Associates at FNBBP. On September 15, 1981, WEA transferred $ 14,000,000 from its account at FNBBP to the account of Island Bank, Ltd., at FNBBP. On September 15, 1981, Island Bank, Ltd., transferred $ 8,976,284.95 from its account at FNBBP to the account of Terla, B.V., at FNBBP. On September 15, 1981, Island Bank, Ltd., transferred $ 5,023,500 from its account at FNBBP to WEA account at Barclays Bank of San Francisco. On September 15, *399 1981, WEA transferred $ 5,035,972.23 from its account at Barclays Bank of San Francisco to Barclays Bank of San Francisco. The bank balance of Island Bank, Ltd., in its account at First National Bank of Boston, Panama (hereinafter FNBBP) on September 14, 1981, was $ 1,728.06. On September 15, 1981, Island Bank, Ltd., made net deposits of $ 297,703,500 into its account at FNBBP. On said date, a series of transfers were made back and forth between various entities and Island Bank, Ltd. The series of transfers back and forth with a particular entity, such as Terla, B.V., and Island Bank, Ltd., on September 15, 1981, have been netted in reaching the net deposits total in Island Bank's account at FNBBP on September 15, 1981. The sources of the net deposits into Island Bank's account at FNBBP on September 15, 1981, were transfers from Terla, B.V., Island Bank's account at Barclays Bank of San Francisco, WEA's account at FNBBP, and BEC. On September 15, 1981, Island Bank, Ltd., transferred $ 297,703,500 in net payments out of its account in FNBBP. Again, these transfers were accomplished through a series of payments. These net payments out of Island Bank's account at FNBBP on September *400 15, 1981, were made to WEA's account at Barclays Bank of San Francisco, Parallax Corp., Mundial Investment, Mator, S.A., Antigua Banking, Ltd., and Sineuri, S.A. On September 16, 1981, the balance in the Island Bank, Ltd., account at FNBBP was $ 1,725.56. On June 26, 1981, Werner Erhard received a check from WEA in the amount of $ 215,000. On June 265, 1981, Werner Erhard sent a check in the amount of $ 215,000 to the Breakthrough Foundation. Breakthrough Foundation then transferred $ 213,519.29 to the account of Kempold, B.V., at Island Bank, Ltd. On August 31, 1981, WEA transferred $ 251,197.22 to Barclays Bank of San Francisco. On December 22, 1981, WEA transferred $ 1,547,645 to est, a.e.c. On September 15, 1981, Antigua Banking, Ltd., transferred $ 1,036,000 to WEA. On September 15, 1981, WEA transferred $ 1,000,000 to Antigua Banking, Ltd. The repayment by WEA of the outstanding $ 5,000,000 loan from Barclays Bank of San Francisco was a prerequisite to the release of the $ 14,000,000 loan to WEA. Margolis arranged with Antigua Banking, Ltd., for a one-day loan to WEA of $ 1,036,000 to enable WEA to repay its loan to Barclays Bank of San Francisco on September 15, 1981. *401 On August 27, 1981, Antigua Banking, Ltd., made transfers of $ 50,000, $ 600,000 and $ 105,575.35 to the Harry E. Wright, Jr., Charitable Trust. On August 27, 1981, the Harry E. Wright, Jr., Charitable Trust transferred $ 750,000 to the account of Island Bank, Ltd. On September 15, 1981, Antigua Banking, Ltd., transferred $ 40,000 to the Harry E. Wright, Jr., Charitable Trust. On December 17, 1981, Antigua Banking, Ltd., transferred $ 250,000 to the Harry E. Wright, Jr., Charitable Trust. On December 17, 1981, the Harry E. Wright, Jr., Charitable Trust transferred $ 250,000 to the account of Island Bank, Ltd., at FNBBP. On December 18, 1981, Island Bank, Ltd., transferred $ 1,000,000 to ICF. The "check request" document relating to this transfer identified the transaction as a transfer of funds for the Harry E. Wright, Jr., Charitable Trust. On December 22, 1981, ICF transferred $ 1,000,000 to St. John Fundacion and on the same date St. John Fundacion transferred $ 1,000,000 to WEA. On August 27, 1981, WEA borrowed from Terla, B.V., an additional $ 6,580,000 on open account loans of $ 2,300,000, $ 3,500,000 and $ 780,000 at 20 percent interest. The amount borrowed from Terla, *402 B.V., was used by WEA as follows: (1) $ 850,854 was retained by WEA as working capital; (2) $ 3,693,868 was paid to est, a.e.c. as adjustments to the purchase prices of various assets to conform to appraised values determined by independent appraisers; (3) $ 1,385,000 was paid to Welbehagen, B.V., for the purchase of the Body of Knowledge; (4) $ 342,829 was paid to Antigua Banking, Ltd., to repay a loan; (5) $ 94,449 was paid to Antigua Banking, Ltd., to purchase outstanding loans to third parties; and (6) $ 213,000 was paid as the balance of the purchase price of the Sirona. Margolis coordinated the transfer of $ 14,000,000 from BEC to ICF to St. John Fundacion. Margolis also instructed Somary with respect to the required agreements and transfers of funds from BEC to ICF and also on the required agreements and transfers of funds from ICF to St. John Fundacion, including the banking instructions that should be issued, the opening of the ICF account at FNBBP, and the fact that St. John Fundacion would be used as a conduit of funds between ICF and WEA. Margolis provided Somary with a draft letter to FNBBP to authorize van Walsum to act on behalf of ICF in the September 15, 1981, *403 banking transactions involving the $ 14,000,000 loan. In or about October 1981, Erhard requested additional funds from Somary, but ICF did not have the resources to enable Somary to comply. Margolis located the additional funds in the amount of $ 1,000,000 from a purported client, the Harry E. Wright, Jr., Charitable Trust. In arranging the loan in December 1981 of $ 1,000,000 to WEA, Margolis, together with Somary and Flores, planned to follow the same procedures that were used with respect to the $ 14,000,000 loan to WEA in September 1981. Margolis was counsel, financial advisor and accountant to the Harry E. Wright, Jr., Charitable Trust. In 1981, Thorne, representing the Trust, agreed to distribute $ 1,000,000 to ICF even though he did not have this amount. Margolis arranged the transaction. ICF thereafter funded a $ 1,000,000 loan to WEA. Thorne did not know that the amount of $ 1,000,000 transferred to ICF was subsequently loaned by ICF to WEA. The Harry E. Wright, Jr., Charitable Trust received the following amounts from Antigua Banking, Ltd.: $ 50,000 on August 27, 1981; $ 40,000 on September 15, 1981; and $ 250,000 on December 17, 1981. Antigua Banking, Ltd., was *404 used as a source of these loans at the suggestion of Margolis. On August 27, 1981, the Harry E. Wright, Jr., Charitable Trust transferred $ 750,000 to Island Bank, Ltd. On December 17, 1981, the Harry E. Wright, Jr., Charitable Trust transferred $ 250,000 to Island Bank, Ltd., through FNBBP. Pursuant to agreement, the amount of $ 1,000,000 was transferred to ICF from the Harry Wright, Jr., Charitable Trust. On or about December 22, 1981, ICF made a restricted loan of $ 1,000,000 to St. John Fundacion, which in turn made a loan of $ 1,000,000 to WEA. Werner Erhard, individually and for WEA, executed a non-negotiable note dated December 22, 1981, payable to St. John Fundacion in the amount of $ 1,000,000 payable on demand at two percent interest. St John Fundacion endorsed the note to the order of ICF. On December 22, 1981, WEA paid $ 1,547,645 to est, a.e.c. consisting of the following items: (1) Part payment of improvements to Mountain Lake Manor, $ 347,815; (2) security and rental deposits on leased offices, $ 329,145; (3) contract for Detroit building, $ 140,212; and (4) miscellaneous other assets, $ 730,473. The bank statements for the St. John Fundacion account at FNBBP *405 for the period January 1982 to October 1985 were forwarded to Mator, S.A., in Panama until March 1983 and were subsequently forwarded to one Rocio Viluce, a former Mator, S.A., employee who left Mator, S.A., to establish a business management company. WEA made the required interest payments to ICF on the $ 1,000,000 note and withheld the statutory withholding tax of 5 percent on such payments to foreign persons. In early 1985, WEA repaid the $ 1,000,000 loan with $ 550,000 of this amount transferred to Island Bank, Ltd., rather than to ICF, and ICF returned the $ 1,000,000 promissory note to WEA. Island Bank, Ltd., informed ICF that it would not release the $ 550,000 unless Somary initiated action in California to uphold the validity of the $ 14,000,000 note. In 1985, repayment of the $ 14,000,000 by WEA was questionable because of developments in the pending matrimonial action between Ellen Erhard and Werner Erhard. As of the time of the trial of this case, the amount of $ 550,000 has not been released by Island Bank, Ltd., to ICF. ICF expended some $ 400,000 out of the payments made by WEA as interest for legal expenses and miscellaneous expenses related to proceedings undertaken *406 by ICF with respect to the validity of the notes in the matrimonial action involving Werner and Ellen Erhard. In August and September 1982, Margolis and Schreiber exchanged memoranda which discussed the treatment of numerous items of concern to Werner Erhard andWEA. A September 7, 1982, memorandum form Margolis to Schreiber concerning audit reports of WEA by certified public accountants enumerated a variety of items that required consideration. In 1981, Werner Erhard personally had a negative net worth. Erhard and his associates did not have available funds to acquire the est, a.e.c. assets in 1981. Since WEA had a balance sheet with assets of less then $ 1,000,000 and would be unable to obtain bank financing, Schreiber requested Margolis to arrange certain short-term financing for the asset acquisition until long-term financing could be arranged. In mid-1983, Werner Erhard filed a personal financial statement with Barclays Bank of San Francisco to obtain a continuing guarantee for WEA in the amount of $ 450,000 in which he did not list the loans of $ 14,000,000 and $ 1,000,000 as liabilities. In 1983, WEA established a bookkeeping account for a sinking fund to repay the combined *407 loan of $ 15,000,000. During the course of the matrimonial action in 1985 between Ellen Erhard and Werner Erhard, substantially all of the funds were withdrawn from the sinking fund pursuant to the direction of the California Supreme Court. Deposits of funds in the sinking fund were subsequently discontinued. The amounts earmarked for the sinking fund were placed in certificates of deposit in the name of WEA. Gilbert T. Schwartz, an attorney, testified as petitioner's expert witness on the subject of banking law and practice and submitted a report. He reviewed the documentary materials pertinent to the $ 14,000,000 promissory note from Werner Erhard to St. John Fundacion and stated that in his opinion the note was bona fide under customary and ordinary banking practices in the United States. His opinion was based on the form of the note and the underlying documentation generated by the various entities involved in the fund transfers. Schwartz was not an expert in the banking practice of Panama, Costa Rica or Switzerland. In his analysis of the bona fide nature of the $ 14,000,000 note, Schwartz did not consider the existence of business purpose, economic substance or the availability *408 of any personal or contractual defenses against the note obligation. A source and application of funds was subsequently prepared by Anthony V. Langone, petitioner's expert witness, of the cash receipts and disbursements of Erhard Seminars Training and est, a.e.c. over the years of their business operations. His conclusions were presented in his expert witness report. Robert Feinerman, a retired presiding justice of the California Court of Appeals, testified as petitioner's expert witness on the enforceability of the $ 14,000,000 note and a $ 1,000,000 note executed by Erhard and on the lending practices of financial institutions. Feinerman examined the notes and other relevant materials and concluded that under California law the $ 14,000,000 was enforceable against Werner Erhard personally. Feinerman stated that the $ 14,000,000 note was subject to the provisions of Article 3 of the Uniform Commercial Code (UCC) adopted by California and that under the UCC, in the event of default by Erhard and WEA, ICF had the right to obtain judgment against Erhard on the note and enforce said judgment against the assets of Erhard. Peter Hafter is a partner in a law firm in Zurich, Switzerland. *409 He is also a director of the Swiss subsidiaries of Morgan Guaranty Bank and of the Swiss Bank in the Rothschild group. It was his opinion that pursuant to Swiss rules on conflicts of law, the validity and enforceability of Erhard's obligations under the $ 14,000,000 note would be determined under California law. Hafter also concluded that the $ 14,000,000 note was enforceable under the laws of Switzerland. On their returns for the taxable years 1981, 1982 and 1983, petitioners claimed depreciation deductions with respect to the property purchased by WEA from est, a.e.c., interest expense deductions relating to the short-term loans, and a pro-rate portion of the interest accrued on the long-term loan. est, a.e.c. reported the gains and losses from the sale of its assets to WEA on its Federal corporate income tax returns for the fiscal years ending June 30, 1981, and June 30, 1982. On November 19, 1984, and December 3, 1985, respondent issued notices of deficiency to est, a.e.c. determining deficiencies for the respective fiscal years ending June 30, 1981, and 1982 in the respective amounts of $ 1,074,950 and $ 1,212,489 plus additions to tax and increased interest. est, a.e.c. *410 filed petitions in the Tax Court for a redetermination of the deficiencies for each of the fiscal years involved. On October 7, 1988, the Tax Court granted respondent's Motion to Dismiss for Failure to Properly Prosecute the case involving the fiscal year ended June 30, 1981, (docket No. 3014-85). On January 9, 1989, the Tax Court granted respondent's Motion to Dismiss for Failure to Properly Prosecute the case involving the fiscal year ended June 30, 1982. (docket No. 4518-86). In the statutory notice of deficiency issued to petitioners for the taxable year 1981 respondent made the following adjustments: (1) Disallowance of the Schedule C depreciation deduction in the amount of $ 884,024 in connection with the activity of the sole proprietorship Werner Erhard & Associates; and (2) disallowance of the Schedule C interest expense deduction in the amount of $ 227,951. In the statutory notice of deficiency issued to petitioners for the taxable year 1982, respondent made the following adjustments: (1) Disallowance of the Schedule C depreciation deduction in the amount of $ 1,471,211 in connection with the activity of the sole proprietorship Werner Erhard & Associates; (2) disallowance *411 of the Schedule C interest expense deduction in the amount of $ 300,000; and (3) disallowances of a Schedule A Charitable contribution carryover in the amount of $ 110,538. In the statutory notice of deficiency issued to petitioners for the taxable year 1983 respondent made the following adjustments: (1) Disallowance of the Schedule C depreciation deduction in the amount of $ 1,332,998 in connection with the activity of the sole proprietorship Werner Erhard & Associates; and (2) disallowance of the Schedule C interest expense deduction in the amount of $ 300,000. OPINION In June 1981, Werner Erhard, doing business as Werner Erhard & Associates (WEA), a sole proprietorship, acquired a variety of assets from est, a.e.c. and other entities. The acquisition of the assets was purportedly financed by short-term loans from Barclays Bank of San Francisco and Terla, B.V., (a Netherlands entity) which were refinanced in September 1981 by a $14,000,000 loan and a subsequent $ 1,000,000 loan from Intercultural Cooperation Foundation, a Swiss entity. WEA claimed depreciation expense deductions in the taxable years at issue with respect to the operating assets acquired from est, a.e.c. and *412 also claimed interest expense deductions in the taxable years involved with respect to the purported short-term and long-term loans. Respondent disallowed both the depreciation expense deduction and the interest expense deductions on the grounds that (1) the transfer of assets should be disregarded because there was no real change in the ownership of the assets and that the transaction lacked economic substance; (2) the $ 14,000,000 and $ 1,000,000 loan transactions were Margolis circular money movements which lacked economic substance; (3) the transaction was purely tax-motivated and lacked any business purpose; and (4) the 1981 transaction was merely the clean-up phase in the tax-planning structure previously installed by Harry Margolis for est, a.e.c. Section 163(a) provides for the deduction of "all interest paid or accrued within the taxable year on indebtedness." In order to be deductible, interest must be paid on genuine indebtedness, an indebtedness in substance and not merely in form. Knetsch v. United States, 364 U.S. 361, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960); Karme v. Commissioner, 73 T.C. 1163, 1185 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). *413 Section 167(a) allows a depreciation deduction for property used in a trade or business or held for the production of income. The depreciation deduction is computed on the adjusted basis of property, which generally is keyed to the cost of such property. Sections 167(g), 1011, and 1012. Cost is defined in the regulations as the amount paid for such property in cash or other property. Section 1.1012-1(a), Income Tax Regs. The application of these statutory provisions necessarily turns upon the realities of the particular transaction. Petitioners have the burden of proof. Rule 142(a). Some background is necessary in order to provide a meaningful perspective to the 1981 transactions. See Erhard Seminars Training v. Commissioner, T.C. Memo 1986-526; see also est, An Educational Corporation v. Commissioner, T.C. Memo 1986-527. Since 1971, when Erhard commenced his operations centered around the dissemination of the so-called Body of Knowledge and other concepts originated by him, Harry Margolis has played a dominant role in the tax planning aspects of the Erhard operations. Until 1975, the Erhard operation was conducted under the corporate *414 form of Erhard Seminars Training, Inc., a California Corporation. Integral to the operations conducted during this period was the employment of the Margolis system which involved the tax-planning techniques of money movements among a congeries of system entities. The on-going financial status of a Margolis client vis-a-vis the system was reflected in the so-called system accounting. In 1975, est, a.e.c., a Nevada corporation, was formed to conduct the business activities previously conducted by Erhard Seminars Training, Inc., i.e., the presentation of the est standard training, seminars and workshops, with essentially the same employees and the same training centers. The ties to the Margolis system entities continued. On or about June 1981, WEA, in essence, replaced est, a.e.c. Again, substantially all of the est, a.e.c. employees became employees of WEA, substantially all of the operating assets of est, a.e.c. became the assets of WEA, and the operations continued without interruption. The acquisition by WEA of the operating assets and certain other assets from est, a.e.c. and from certain system entities was accomplished in four phases. The first phase, which took place *415 in June-July 1981, was financed by a loan of $ 2,200,000 to WEA from Terla, B.V., a system entity, and a loan of $ 5,000,000 to WEA from Barclays Bank of San Francisco. The Barclays Bank of San Francisco loan was secured by Parallax, a system entity. The proceeds of the loans were then used by WEA to acquire the operating assets from est, a.e.c., to repay a Werner Erhard loan from Barclays Kol, to repay a Werner Erhard loan from Associated Advisors, to acquire certain art works from Alexia, to pay a deposit to Associated Advisors for the auxiliary sloop Sirona, and for a quitclaim from PMSA. Many of the monetary transfers to and from WEA to effectuate these transactions took place on June 1, 1981. The record also shows that on May 29, 1981, est, a.e.c. transferred $ 4,657,000 to Welbehagen, B.V. There is also evidence in the record indicating that the original loan from Barclays Kol to Werner Erhard in 1977 or 1978 had been secured by a collateral deposit from a system entity. We also note that the est, a.e.c. stock was held by the Werner Erhard Charitable Settlement and that Alexia was trustee of the Werner Erhard Charitable Settlement. Both the Werner Erhard Charitable Settlement *416 and Alexia were system entities. The following diagram reflects the money movements that were generated in phase one and the results achieved: [SEE ILLUSTRATION IN ORIGINAL] Phase two took place on or about August 27, 1981, and was financed by three separate loans to WEA from Terla, B.V., in the total amount of $ 6,580,000. The proceeds of these loans were then used by WEA as follows: To est, a.e.c. for adjustments on assets purchased; to Welbehagen, B.V., for the Body of Knowledge; to Antigua Banking Ltd., as repayment of a loan and for the purchase of certain loans; to Associated Advisors for the purchase of the auxiliary sloop Sirona. On August 27, 1981, est, a.e.c. made three transfers to Welbehagen, B.V., in the total amount of $ 4,571,250. The following diagram reflects the money movements that were generated in phase two and the results achieved: [SEE ILLUSTRATION IN ORIGINAL] Phase three took place on September 15, 1981. After the completion of phases one and two, WEA owed approximately $ 13,800,000 in short-term debt to Terla, B.V., and Barclays Bank of San Francisco. Phase three was financed with a purported loan of $ 14,000,000 from Intercultural Cooperation Foundation. *417 The purported source of the loan was Brown Educational Corp., a Margolis controlled entity which at this time had a cash position of less than $ 1,000. Actually, the $ 14,000,000 originated with the system entity Sineuri, S.A., (which in turn obtained a much larger transfer from Island Bank, Ltd.) and then went from Sineuri, S.A., to Brown Educational Corp., to Intercultural Cooperation Foundation, to St. John Fundacion, to the account of WEA at the First National Bank of Boston in Panama (FNBBP). WEA transferred this amount from its FNBBP account to the Island Bank, Ltd. account at FNBBP. Island Bank, Ltd. then transferred $ 8,976,284.95 to Terla, B.V., and $ 5,023,500 to the WEA account at Barclays Bank of San Francisco. WEA then transferred $ 5,035,972.23 from its account at Barclays Bank of San Francisco to Barclays Bank of San Francisco. At this point the compensating deposit of $ 5,000,000 previously made by Parallax as security for the Barclays Bank of San Francisco loan was released. The following diagram reflects the money movements that were generated in phase three and the results achieved: [SEE ILLUSTRATION IN ORIGINAL] The fourth phase took place in December 1981 *418 ostensibly to enable WEA to complete the acquisition of assets from est, a.e.c. The acquisition was financed with a loan to WEA from Intercultural Cooperation Foundation via St. John Fundacion. The source of the $ 1,000,000 was the Harry E. Wright, Jr., Charitable Trust, an entity effectively controlled by Harry Margolis. The Harry E. Wright, Jr., Charitable Trust obtained the necessary funds for the loan from Antigua Banking, Ltd., and the ABC Trust Co. (both system entities). The money movement was from the Harry E. Wright, Jr., Charitable Trust to Island Bank, Ltd., to Intercultural Cooperation Foundation, to St. John Fundacion, to WEA, to est, a.e.c. In December 1981, WEA also transferred $ 585,250 to est, a.e.c. for pre-registration bonuses. The following diagram reflects the money movements that were generated in phase four and the results achieved: [SEE ILLUSTRATION IN ORIGINAL] The transactions encountered here illustrate the use of circular money movements and system entities to supplement the Margolis tax-planning. The evidence shows that the money movements were planned in advance in the Margolis office and collated through the use of documentary authorization *419 forms directing the money flow among the participating entities. Moreover, the record clearly shows that the money movement technique made possible a group of transactions with a total value far in excess of the actual cash involved. The circular money movements here involved generally began and ended with system entities, with no change in the economic position of the system viewed as a whole. Quite often, the money movements occurred in a single day. The stream of money flowing through the intermediate entities, supported by mere bookkeeping entries or by the devices of back to back loans, was without economic substance. See Karme v. Commissioner, supra.
It is established that the economic substance of a transaction, rather than its form, must control for Federal tax purposes. Gregory v. Helvering, 293 U.S. 465, 79 L. Ed. 596, 55 S. Ct. 266 (1935); Zmuda v. Commissioner, 79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). In Falsetti v. Commissioner, 85 T.C. 332, 347 (1985), we defined "sham in substance" as the expedient of drawing up papers to characterize transactions contrary to economic realities *420 and which have no economic significance beyond tax benefits. The use of the Margolis circular money movement techniques to create the illusion of legitimate transactions has been the focus of attention in a number of cases. See, e.g., Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; Karme v. Commissioner, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); Marine v. Commissioner, 92 T.C. 958 (1989), affd. 921 F.2d 280 (9th Cir. 1991); Estate of Nazarian v. Commissioner, T.C. Memo 1989-179; Gurdin v. Commissioner, T.C. Memo 1987-69; Erhard Seminars Training v. Commissioner, T.C. Memo 1986-526; and est, An Educational Corporation v. Commissioner, T.C. Memo 1986-527. An examination of the circular money flow in each of the four phases, in which the participation and orchestration by Harry Margolis is amply demonstrated by the record, underscores the complete absence of economic substance sufficient to support the depreciation and *421 interest expense deduction here at issue. In phases one and two the various amounts simply circled out of the system through WEA and back into the system except for cash retained by WEA from the flow in the amount of $ 2,249,323 in phase one and $ 850,854 in phase two. Phase three is a unique demonstration of the artificiality of these transactions, notwithstanding the paper trail of documentation generated by the money movement. The ostensible purpose of phase three on September 15, 1981, was to replace the short-term debts purportedly created previously in financing phases one and two. To bolster the legitimacy of the transaction, counsel for petitioner recommended that the financing for the acquisition of the est, a.e.c. assets by WEA should come from a disclosable source. Margolis thereupon obtained the assistance of Wolfgang F. Somary who allowed the Intercultural Cooperation Foundation to serve in the role of lender. Intercultural Cooperation Foundation of course did not have the requisite funds. Again, to assuage the concerns of petitioner's counsel as to the source of the loan, Margolis stated that the amount of $ 14,000,000 was available from a group of Oklahoma oil *422 investors. Actually, the amount of $ 14,000,000 originated as part of a money movement from Sineuri, S.A. The flow of funds went from Sineuri, S.A., to Brown Educational Corp., to Intercultural Cooperation Foundation, to St. John Fundacion to WEA. It is significant that the flow of $ 14,000,000 through Intercultural Cooperation Foundation and St. John Fundacion never left the control of the Margolis system. Margolis associates Everd B. van Walsum and Paul T. Mason acted on behalf of Intercultural Cooperation Foundation and St. John Fundacion, respectively. WEA then transferred $ 14,000,000 from its account at FNBBP to the Island Bank, Ltd., account at FNBBP. Island Bank, Ltd., then transferred $ 8,976,284.95 to Terla, B.V.'s account at FNBBP and $ 5,023,500 to Barclays Bank of San Francisco. When the Barclays Bank of San Francisco loan was repaid, the compensating deposit of Parallax at Barclays Bank of San Francisco was released and the funds accordingly returned to the Margolis system. All of these orchestrated transactions took place on September 15, 1981. Thus, the Terla, B.V., and Barclays Bank of San Francisco loans which had originated from system funds (directly or *423 indirectly) in phases one and two were repaid with system funds in phase three, and the total amount of such repayments was returned, directly or indirectly, to the system. The $ 1,000,000 loan used in phase four by WEA for the purported purchase of final assets from est, a.e.c. followed a similar pattern. Again, the funds originated in a money movement from the Margolis system through the Harry E. Wright, Jr., Charitable Trust, to Island Bank, Ltd., to Intercultural Cooperation Foundation to St. John Fundacion to WEA and from WEA to est, a.e.c. We conclude, on the basis of the entire record, that WEA did not acquire the est, a.e.c. operating assets as well as the non-operating assets acquired from several other entities in the course of the transactions here involved through bona-fide purchase. We are convinced, and so conclude, that petitioner acquired such assets through sham transactions. We also conclude that the $ 14,000,000 and $ 1,000,000 loans purportedly obtained by petitioner to finance the acquisitions were sham transactions completely lacking economic substance and that, consequently, the amounts supposedly paid by petitioner as interest on these loans were not paid *424 on a genuine indebtedness within the meaning of the statute. We are persuaded that the entire series of events that transpired in 1981 merely represented the so-called "clean-up" phase in which the structure created by Margolis for Werner Erhard in 1975 was shed as a prelude to a new structure. Such periodic restructuring was a feature of the Margolis tax planning for Erhard. Erhard Seminars Training, Inc., was used as the vehicle for the Erhard business operations from 1971 to 1975, at which time it was replaced by est, a.e.c. which in turn was replaced by WEA in 1981. Work on the latest restructuring began on or about May 1980 as a project to "create est anew." The system accounting maintained by the Margolis office was designed to reflect a client's cash position within the system. Consequently, when est, a.e.c. was deemed no longer useful it was imperative for Erhard to ascertain his financial position at that juncture vis-a-vis the system. Investigation of the legal structure of est, a.e.c. was complete in May or June 1980 by legal counsel retained by est, a.e.c. and Erhard. Gary Grace, a former employee of est, a.e.c. and a member of the task team formed to augment the *425 transition process, made an exhaustive investigation of Erhard Seminars Training, Inc., est, a.e.c. and the personal financial status of Erhard for the period 1971-1980 with respect to the Margolis system. It does not appear that any effort was made in the system accounting to differentiate between Werner Erhard and the entities (Erhard Seminars Training, Inc., and est, a.e.c.) which were used to conduct the Erhard business operations over the years. It then remained for Werner Erhard to remove the operating assets from est, a.e.c., to regain a variety of non-operating assets which had been acquired in the name of various system entities and, in general, to balance accounts with the system. This was accomplished in the transactions which took place for the most part in phases one through four in 1981. Werner Erhard (or WEA) obtained all the business assets needed to continue his operations. Personal loans owed by Werner Erhard in substantial amounts were repaid. He also acquired possession of art work valued at some $ 765,038 which had been held in the name of a system entity, the auxiliary sloop Sirona valued at $ 225,000 which had also been held in the name of a system entity *426 and certain motor vehicles. It also appears that some $ 3,000,000 remained with Erhard (or WEA) as a result of the circular money movements in phases one and two. The transactions of 1981 were structured as purchases by Erhard of the various assets at fair market values based upon competent appraisals. However, as the record amply demonstrates, the purported purchases were made possible only by the circular money movements orchestrated by Margolis. The artificial nature of the money movements and the absence of any economic substance in the ephemeral contractual relationships created by such money flows deprives the entire series of transactions of any economic validity. In short, the transactions were illusory in nature. Petitioner relies upon the testimony of expert witnesses to support the validity of the transactions in 1981. As a rule, we may embrace or reject opinion testimony if, in our best judgment, such action is proper. See Helvering v. National Grocery Co., 304 U.S. 282, 82 L. Ed. 1346, 58 S. Ct. 932 (1938). Gilbert T. Schwartz, an attorney, testified as petitioner's expert witness on the subject of banking law and practice. He reviewed the bank records and correspondences *427 relating to the September 15, 1981, transaction and concluded that under customary and ordinary United States banking practice, the $ 14,000,000 non- negotiable note from Werner Erhard to St. John Fundacion (and then endorsed to ICF) was an enforceable promissory note. Robert Feinerman, a former judge of the California Court of Appeals with some experience in banking matters, concluded that both the $ 14,000,000 and the $ 1,000,000 non-negotiable notes from Werner Erhard to St. John Fundacion were enforceable under California law. Peter Hafter, partner in a law firm in Switzerland, also concluded that both notes were enforceable against Werner Erhard in Switzerland. We have considered the opinion testimony of the three expert witnesses as well as their reports. Schwartz examined the background documents, but the full circular flow of the money movement beginning with a system entity, Sineuri, S.A., and effectively ending with system entity is not a part of his analysis. Neither Feinerman nor Hafter, in concluding that the notes executed by Werner Erhard are enforceable, took into consideration the fact the notes were generated as a part of the circular money movements that took *428 place. Each of the witnesses conclude, in essence, that the form of the promissory notes was correct and hence they were enforceable and, further, that the various steps, when viewed in isolation, did not deviate from customary and normal banking procedures. We believe that such heavy emphasis on the form of the documents involved dispels the effectiveness of the conclusions reached. In short, we find them unpersuasive in the factual context of this case. We have also considered the testimony of Anthony V. Langone, who testified as an expert witness for petitioner. Langone prepared a source and application of funds analysis of the cash receipts and disbursements of both Erhard Seminars Training, Inc., and est, a.e.c. covering a total period of some 10 years (1971 through May 30, 1981). He concluded, inter alia, that the source of the two loans in 1981 to Werner Erhard in the total amount of $ 15,000,000 was neither Erhard Seminars Training, Inc., nor est, a.e.c. We give little weight to this opinion testimony. In preparing his analysis, Langone relied upon tax returns filed by the two entities as well as accounting records of other related entities. In Erhard Seminars Training v. Commissioner, T.C. Memo 1986-526, *429 and in est, An Educational Corporation, T.C. Memo 1986-527, this Court concluded that the taxpayers engaged in sham transactions during the years covered by the Langone analysis, and we consequently disallowed deductions in substantial amounts for numerous items which were created by the sham transactions. Since the analysis prepared by Langone rests in large part on the purported accuracy of the returns and related records of the two entities, we deem his analysis seriously flawed. We have examined the report, with the accompanying exhibits, and we are unable to agree with the conclusions reached. Petitioner contends that the decision to shed est, a.e.c. in 1981 and continue the Erhard operations as Werner Erhard & Associates, a sole proprietorship, was prompted by business realities and that the transactions between WEA and est, a.e.c., as well as the financial obligations purportedly incurred, were thus valid and should be given effect for tax purposes. The business reality, argues petitioners, was to escape the perceived financial damage to the enterprise caused by the continued association of the enterprise with Margolis. Petitioner also contends that *430 continued association with Margolis was detrimental to the public image of the enterprise. We do not find such argument convincing. Apart from generalities, there is little evidence in the record to document this perceived adverse effect to the enterprise cause by Margolis. Moreover, even if the avowed purpose was to obliterate the Margolis connection, the record establishes that this did not occur. Quite the opposite, Margolis continued to play a significant role in the affairs of WEA, the new entity. He orchestrated the circular money movements that served as a vehicle for the transfer of both operating and non-operating assets to WEA in the form of purchase agreements. The Margolis money movements also generated, directly or indirectly, the loans used to finance the purported purchase transactions. The deductions claimed by the WEA operation during the years here involved are inextricably linked to these events. In view of the Margolis penchant for periodically shedding the entities used to conduct the Werner Erhard enterprises and continuing the operations largely unchanged in some new form with substantially the same personnel, the readily available web of Margolis system *431 entities to shield the true ownership of assets that in reality belonged to the Werner Erhard operation, and the use of the parallel system of system accounting used to monitor the cash position of Werner Erhard vis-a-vis the system, regardless of which entity was currently conducting the Erhard operation make it difficult to accept petitioner's version of the reasons that prompted the 1981 transfer of assets from est, a.e.c. to WEA. We believe that est, a.e.c. was in effect terminated as originally contemplated in 1975, a financial accounting was rendered for Werner Erhard covering some 10 years of close involvement with the system and its entities, and the assets transferred to Werner Erhard in an artificial series of transactions that produced the depreciation expense deductions in 1981, 1982, and 1983 in the respective amounts of $ 884,024, $ 1,471,211, and $ 1,332,998 and interest expense deductions in the respective amounts of $ 227,951, $ 300,000, and $ 300,000. We conclude that the circular money movements were shams designed to simulate the transactions here involved. We further conclude that the purported purchase transactions and loans, both short-term and long-term, *432 were artificial transactions lacking any business purpose and were without economic substance and, consequently, will be disregarded. We hold, on this record, that petitioner is not entitled to the depreciation expense deductions under section 167(a) and the interest expense deduction claimed under section 163(a). In short, there is nothing in this record that would permit a finding of any basis for any of the assets in the hands of WEA. Our conclusion that the loans, both short-term and long-term, were sham transactions without economic substance disposes of petitioner's alternative argument that the purported interest payments are deductible under the provisions of section 162(a) as ordinary and necessary business expenses or under section 165 as business losses. Section 6653(a)(1) imposes an addition to tax equal to five percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) imposes an addition to tax in the amount of 50 percent of the interest due on the portion of the underpayment attributable to negligence. For the purposes of these sections, negligence is the failure *433 to use due care or to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner has the burden of proof on this issue. Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Reasonable reliance by a taxpayer on the advice of an attorney or accountant is sufficient to avoid the addition to tax for negligence. United States v. Boyle, 469 U.S. 241, 250, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985). Such reasonable reliance on professional advice may suffice even if the advice is wrong. Estate of Paxton v. Commissioner, 86 T.C. 785, 820 (1986). "Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney." United States v. Boyle, supra at 251. Here, the record shows that competent attorneys and accountants were closely involved in the complex endeavors to transfer *434 the est, a.e.c. assets and the assets held by system entities to Werner Erhard in 1981. The tax professionals involved were for the most part sufficiently informed to be in a position to give competent advice. The attorneys had been involved in the investigation of the est, a.e.c. structure and its link with the Margolis system and were thus familiar with the background of the events in the years preceding the 1981 transactions. A tax partner from a national accounting firm worked on the schedules pertaining to the WEA operations in petitioner's returns for the years involved. Petitioner was assured by his tax attorneys and the accounting professionals with respect to particulars on his tax returns for the years before us. We have also considered the countervailing strains in the record. An attorney who was closely involved in the investigation of the pre-1981 organizational structure surrounding est, a.e.c. as part of the project to continue the operations in a new form referred to the structure as a "web" and a "swamp." Some of the elements of the maze of entities seemed to defy understanding, and some doubt exists whether the needed information was fully available. Nonetheless, *435 in view of the large role played by competent counsel in this matter, we conclude that petitioner was not negligent or in intentional disregard of rules and regulations. Consequently, we hold that petitioner is not liable for the additions to tax in 1981, 1982, and 1983 under the provisions of section 6653(a)(1) and (2). With respect to returns filed after December 31, 1982, section 6661(a) imposes an addition to tax on any substantial understatement of income tax. A substantial understatement is one that exceeds the greater of either 10 percent of the tax required to be shown on the return or $ 5,000. Section 6661(b)(1). The amount of the understatement is reduced if there is substantial authority for the tax treatment of the item at issue (section 6661(b)(2)(B)(i)) or if the relevant facts affecting the items tax treatment are adequately disclosed (section 6661(b)(2)(B)(ii)). There exists no perceivable authority, statutory or otherwise, for the tax treatment claimed by petitioner with respect to the items in dispute. The transactions purporting to support the tax treatment of such items were illusory and completely devoid of economic substance. See Karme v. Commissioner, supra. *436 Moreover, there is no disclosure on the returns of the relevant facts affecting the tax treatment of the item at issue. Under section 6661(c), respondent is permitted to waive the addition to tax if the taxpayer shows reasonable cause and good faith regarding the understatement. The most important factor in making a determination regarding waiver of the addition is the extent of the taxpayer's effort to assess his proper tax liability under the law. Sec. 1.6661-6(b), Income Tax Regs. The standard of review in the case of a failure to grant a waiver is whether respondent abused his discretion. Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988). On this record we find that respondent did not abuse his discretion in denying a waiver of the addition to tax pursuant to section 6661(c). Finally, petitioner argues, in effect, that section 6661 should not be applied retroactively to transactions which took place in 1981. Section 6661(a) was originally added to the Code by section 323(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-24, 96 Stat. 324, 613, and was made applicable to returns due after December 31, 1982, (sec. 323 of the act, *437 96 Stat. at 615. Section 8002(b) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, 100 Stat. 1874, 1951, increased to 25 percent the addition for substantial understatement, effective for additions assessed after October 21, 1986. Because the addition here will be assessed after that date, the 25-percent rate applies. Pallottini v. Commissioner, 90 T.C. 498 (1988). Petitioner's arguments on the applicability of section 6661, as amended, to petitioner's taxable years 1982 and 1983 therefore is without merit. Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6601 if there is a "substantial underpayment" (an underpayment which exceeds $ 1,000) in any taxable year attributable to one or more "tax motivated transactions." The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Among the transactions enumerated in the statute as "tax motivated" is "any sham or *438 fraudulent transaction." Sec. 6621(c)(3)(A)(v). Since we conclude on this record that the transactions herein involved represented factual shams, we hold that section 6621(c) is applicable. Respondent is sustained. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the underpayment of $ 456,431.00 attributable to negligence.
** 50 percent of the interest due on the underpayment of $ 747,413.50 attributable to negligence.
*** 50 percent of the interest due on the underpayment of $ 494,446.00 attributable to negligence.↩
2. The use of such words as "borrow," "loan," "interest," "purchase," and "payment" in our findings of fact is for narrative convenience, describing the form of the transaction, and is not intended to indicate any conclusion concerning the actual substance of the transaction in question.↩